Paul **BROGA**, Robert Gamache, Alfred Goncalves, Michael A. Iavarone, Sr.,Robert L. Klein, Robert Laporta, Donald M. Lawyer, Susan Berry, as executrix of the estate of Lawrence LeBrun, Edward W. Lemay, Armand L. Normandy, Donald L. O'Kane, Dan-

iel M. Pennella, Gayle Hopkins, as executrix of the estate of Arthur Reil, Alphonso L. Riccardelli, Mary Roberge, William Schreindorfer, Viola Sorensen, Eugene F. Sturgeon, Constantine Ventsias, Plaintiffs,

v.

NORTHEAST UTILITIES, Defendant.

Nos. 3:96CV1930 (DJS),
3:96CV2114 (DJS).

United States District Court,
D. Connecticut.

March 31, 2004.

Thomas G. Moukawsher, Moukawsher & Walsh, Groton, CT, for Plaintiffs/Consol Plaintiffs.

Charles F. Corcoran, III, Carmody & Torrance, New Haven, CT, David S. Hardy, Levett Rockwood, PC, Westport, CT, Duncan Ross MacKay, Northeast Utilities Service Co., Hartford, CT, Howard K. Levine, Carmody & Torrance, New Haven, CT, Lucy M. Romeo, Carmody & Torrance, New Haven, CT, for Defendant.

Joseph E. Moukawsher, Moukawsher & Walsh, Groton, CT, for Plaintiff.

## MEMORANDUM OF DECISION

SQUATRITO, District Judge.

This is an action for damages in which nineteen Plaintiffs allege that Defendant Northeast Utilities ("Defendant" or "NU") breached its fiduciary duty to them. Plaintiffs' claims are brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

The Court held a bench trial on these claims, and now issues the following Memorandum of Decision, including Findings of Fact and Conclusions of Law:

### I. EVIDENTIARY ISSUES

There were several evidentiary issues presented to the Court that were deferred to this Memorandum of Decision. The Court will address those issues at the outset, before presenting its Findings of Fact and Conclusions of Law.

The first issue presented to the Court was the admissibility of the affidavits of direct testimony offered by Plaintiff Lawrence LeBrun ("LeBrun") and Plaintiff Viola Sorensen ("Sorensen"). LeBrun was gravely ill at the time he was scheduled to testify at trial and unable to appear for cross-examination and re-direct examination concerning his affidavit of direct testimony. Before the trial proceedings reached their conclusion, LeBrun died and, as a result, LeBrun's deposition was entered into evidence. Sorensen represented to the Court by affidavit that she was unable to testify because she was tending to the health needs of her brother. The Court must decide whether her deposition transcript will be allowed into evidence. Lastly, the Court will address the admissibility of the interrogatory responses of LeBrun and Plaintiff Arthur Reil ("Reil"), who died before the trial began. Reil was never deposed.

The Court will first consider the hearsay implications of each of these statements, and then further discuss Sorensen's deposition transcript.

### A. Hearsay implications of LeBrun's, Reil's and Sorensen's statements

NU has moved to exclude LeBrun's and Sorensen's affidavits of direct testimony, LeBrun's and Reil's interrogatory responses, and Sorensen's deposition transcript. The basis of each objection is that these statements are inadmissible hearsay and are not otherwise admissible under any of the hearsay exceptions provided in the Federal Rules of Evidence. Under Federal Rule of Evidence 801(c), hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). A statement that fits this criterion is inadmissible, unless it falls under any of the hearsay exceptions set forth in the Federal Rules of Evidence. In this case, the Court first finds that the relevant statements are inadmissible hearsay, and second, that they are not otherwise admissible under any of the hearsay exceptions.

First, the statements at issue in this case meet the definition of hearsay set forth in the Federal Rules of Evidence. Each statement was made out of court, as

the declarant was not testifying at the trial or at a hearing. Specifically, the affidavits of direct testimony were prepared by LeBrun, Reil and Sorensen, with the assistance of Plaintiffs' counsel, before the trial began. Reil's and LeBrun's interrogatories were prepared in the same way, years before the trial began. Sorensen's deposition was taken outside of a trial setting, again before the trial began.

LeBrun, Reil and Sorensen offer these affidavits of direct testimony to prove the truth of the matters asserted. Plaintiffs contend in their briefing on this issue that this is not the case, and that instead they offer these affidavits to show the state of mind of the declarants. The Court cannot accept this proposition. Like any testimony, the most critical aspects of these affidavits are being offered to prove the truth of the matters asserted therein—what was said to Plaintiffs either at the time they considered retirement or at the time of their actual retirement. Moreover, the perceptions expressed by Plaintiffs in these affidavits are being offered for their truth. Statements of the type contained in these affidavits invoke the concerns meant to be addressed by the hearsay rule, and meet the definition of hearsay contained in the Federal Rules of Evidence.

■ Second, the Court finds that the affidavits do not fall under any of the exceptions to the hearsay rule listed in the Federal Rules of Evidence, particularly Rules 803(3) and 807. The residual exception to the hearsay rule, Rule 807, does not apply. The residual hearsay rule provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed.R.Evid. 807. The residual exception to the hearsay rule is used "very rarely, and only in exceptional circumstances." *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir.1991). If a court is to create one of these exceptional circumstances, it must first evaluate whether the statements at issue satisfy the five requirements listed in Rule 807—trustworthiness, materiality, probative importance, the interests of justice and notice. In addition, the statements must be evaluated to assess whether the four classic hearsay dangers, which are insincerity, faulty perception, faulty memory and faulty narration, are minimized. *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 233 (2d Cir.1999). "Hearsay statements need not be free from all four categories of risk to be admitted under Rule 807." *Id.*

■ In this case, the Court believes that the affidavits of LeBrun, Reil, and Sorensen do not meet this criteria. First, the Court cannot find that the statements have circumstantial guarantees of trustworthiness. The fact that these statements were prepared by, or in conjunction with Plaintiffs' counsel is just one reason why they cannot be considered trustworthy. While the Court does not mean to imply that it

believes Plaintiffs' counsel or LeBrun, Reil and Sorensen intentionally included misstatements or untruths in their affidavits or interrogatory responses, the fact that they were prepared in the context of litigation raises concerns. The most truthful of discovery or trial declarations still cannot escape the reality that they are prepared with the "incentive to set forth the facts in a light most favorable to itself." *Kirk v. Raymark Industr., Inc.,* 61 F.3d 147 (3d Cir.1995). This raises strong concerns for the Court, especially because NU was prejudiced by its inability to challenge these self-interested statements at trial.

In addition, the Court does not believe that any circumstances diminish its concern in this case. The fact that the affidavits in question are similar to those made by the other Plaintiffs does not make them more trustworthy. While some portions of the statements contained in the affidavits may be similar, they also contain facts specific to each Plaintiff that cannot be corroborated by or analogized with other Plaintiffs. In addition, the Court cannot help but note that several of the Plaintiffs adjusted or clarified their affidavits while testifying at trial. Even though the adjustments made were sometimes minor in the Court's estimation, the fact that any changes at all were made leads the Court to conclude that these Plaintiffs may also have altered their testimony if subject to examination at trial. Finally, while Gerard Turner ("Turner"), a witness for the Defendant, did testify that he "typically" told Plaintiffs things that were similar to the things included in the affidavits in question, this testimony is not specific enough to corroborate the hearsay statements sought to be admitted.

While the other criteria included in the residual hearsay rule—materiality, probative importance, interests of justice and notice—could be met in this case, the inherent lack of trustworthiness of the statements is most troubling to the Court. With this being the case, the Court cannot admit the statements under the residual hearsay exception.

■ In addition, the statements are not admissible under the present state of mind exception under Federal Rule of Evidence 803(3). This rule provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness ... A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed.R.Evid. 803(3). The Court does not find that this rule is applicable to the statements at issue.

First, this rule specifically excludes any "statements of memory or belief to prove the fact remembered or believed unless it relates to [a will]." Fed.R.Evid. 803(3). In this case, however, the statements offered by LeBrun, Reil and Sorensen almost exclusively relate to their recollections of the past, and were not made contemporaneously. If the Court were to admit them as evidence, it would be in contravention with Second Circuit cases which have held that in order for a statement to qualify for the benefits of Rule 803(3), it must "face forward, rather than backward." *See, e.g., U.S. v. Harwood,* 998 F.2d 91, 98 (2d Cir.1993).

In addition, the Court does not find the parallel to the court's ruling in *Leyda v. Allied Signal, Inc.* that is suggested by Plaintiffs. No. 3:99cv76, slip. op. (D.Conn.) (JCH). In that case, witnesses

were allowed to testify about past statements made to them by their family members, who were plaintiffs in the case. At the time the statements were made, they expressed contemporaneous perceptions that were pertinent to the issues raised in the case. The statements proposed to be offered here, however, are quite different, as they do not have the same contemporaneous aspect to them. Finally, the statements do not concern a will, but rather retirement benefits. Thus, the statements do not fall under the present state of mind exception to the hearsay rule.

In sum, the Court finds that the affidavits of direct testimony and interrogatories from LeBrun, Reil and Sorensen are inadmissible hearsay, not covered by any recognized exception to the hearsay rule.

### B. The admissibility of Sorensen's deposition testimony

■ The Court also finds the deposition testimony of Sorensen inadmissible. Under the Federal Rules of Evidence, deposition testimony may be offered in lieu of live testimony if the declarant is unavailable. Fed.R.Evid. 804. Federal Rule of Evidence 804 provides that a declarant is unavailable under five circumstances:

> "Unavailability as a witness" includes situations in which the declarant—(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or (2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or (3) testifies to a lack of memory of the subject matter of the declarant's statement; or (4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or (5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means. A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying.

Fed.R.Evid. 804(a).

None of these circumstances are present in this case. Sorensen was not prevented from testifying based on privilege, did not defy a Court order to testify, and did not claim a lack of memory. Furthermore, while Sorensen did submit that her brother was suffering from an illness, she herself was not suffering from a physical or mental illness or infirmity. Finally, Sorensen cannot meet the last criteria, that the proponent of the statement has been unable to compel a witness to testify by process or other means, because she herself has decided not to come to Court to testify. The Court is sympathetic to Sorensen's family situation, and does not claim that she had any sinister motive in failing to appear. However, the Federal Rules of Evidence to which the Court is bound clearly and unambiguously preclude the admission of her deposition testimony because she does not meet the unavailability criteria therein.

For the foregoing reasons, the Court finds that the affidavits of direct testimony submitted by Plaintiffs Reil, LeBrun and Sorensen, the interrogatory responses of Reil and LeBrun, and the deposition testimony of Sorensen are inadmissible under the Federal Rules of Evidence.

## II.  STATUTE OF LIMITATIONS

Another preliminary issue presented to the Court that was similarly deferred to this Memorandum of Decision regards the statute of limitations. The Court will rule on this issue before offering its Findings of Fact and Conclusions of Law.

The Court must always address the timeliness of any plaintiff's claim for breach of fiduciary duty under § 413(2) of ERISA. Section 413(2) describes the applicable statute of limitations, as follows:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of-

. . . .

(2) three years after the earliest date on which the Plaintiff had actual knowledge of the breach or violation; except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. Based on this language, an ERISA plaintiff is only entitled to bring a claim for breach of fiduciary duty within three years of the earliest date he had "actual knowledge" of the breach or violation, or, as an exception to this rule, where a plaintiff shows "fraud or concealment," he must bring a claim for fiduciary duty within six years of the date he discovered a breach or violation.

The Court has addressed this issue once before in this case. In an earlier ruling, the Court dismissed Plaintiffs' claims as time-barred, based on its conclusion that the Plaintiffs had actual knowledge of the alleged breach or violation more than three years before they filed their claims. This conclusion was based on the Court's assessment that the Plaintiffs had "actual knowledge" of the breach or violation at the time the early retirement programs were actually announced to NU employees, contrary to what they claimed they had been told by NU management. Although the Court dismissed Plaintiffs' claims under the three-year statute of limitations on that basis, it granted leave to Plaintiffs to amend their Complaint in order to comply with the six-year statute of limitations. In other words, the Court allowed the Plaintiffs to amend their Complaint to allege fraud or concealment with the requisite particularity. Soon after the Plaintiffs did so, the case proceeded to trial.

While the case was moving toward trial, the Second Circuit issued a decision in *Caputo v. Pfizer*, 267 F.3d 181 (2d Cir. 2001). One of the many issues discussed in *Caputo* was ERISA's statute of limitations for fiduciary duty claims, particularly the meaning of the term "actual knowledge." Among other things, the Appellate Court called into question an analysis provided by many courts—including this Court in this earlier decision—that the release of an early retirement program, in and of itself, would provide a plaintiff with enough information to constitute "actual knowledge" of a breach or violation of fiduciary duty.

In light of *Caputo*, the parties requested that this Court vacate its earlier ruling on the statute of limitations issue. The Court agreed that this would be the most prudent course, and indicated that it would revisit the statute of limitations issue in this opinion, applying the Second Circuit's decision in *Caputo*. The *Caputo* court provided guidance to lower courts in this Circuit on the issue of ERISA's statute of limitations for fiduciary duty claims. The Appellate Court was clear from the outset that the statute of limitations it was working with in *Caputo*—the same statute of limitations that is at issue in this case—is

"enigmatic—almost chimerical," and is "[h]eld together by chewing gum and baling wire." *Id.* at 188. *Caputo* added one more wad of gum—or piece of wire—to this statute of limitations. The Court addressed two issues in its ruling; first, the meaning of "actual knowledge" in the three-year statute of limitations; and second, the definition of "fraud or concealment" in the six-year statute of limitations.

## A. Three–Year Limitations Period

On the first issue, the Second Circuit for the first time defined actual knowledge as the term related to ERISA's statute of limitations. The case arrived at the circuit court after the district court held that plaintiffs' fiduciary duty claims were time-barred because they had actual knowledge more than three years before they filed suit. The district court based this conclusion on its assessment that plaintiffs had actual knowledge of a breach or violation when the defendant announced the early retirement program, contrary to what they believed they had been told about the defendant's future plans. The circuit court disagreed with the district court's assessment of when the plaintiffs held this actual knowledge, and reversed.

The Second Circuit defined actual knowledge as follows:

> [W]e now hold that a plaintiff has "actual knowledge of the breach or violation" ... when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act. While a plaintiff need not have knowledge of the relevant law, he must have knowledge of all facts necessary to constitute a claim. Such material facts "could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm."

*Id.* at 193 (internal citations omitted). Notably, the court specifically rejected the district court's analysis that the release of an early retirement program alone could provide enough information to a plaintiff to constitute actual knowledge: "[t]he disclosure of a transaction that is not inherently a statutory breach of fiduciary duty ... cannot communicate the existence of an underlying breach." *Id.* The Court had several reasons for this conclusion. First, the Court concluded that the early retirement program offered by the defendant was not "inherently suspect, nor did it constitute a breach of fiduciary duty or an ERISA violation" at first glance, and was thus "insufficient to trigger the three-year statute of limitations." *Id.* The Court said:

> Although the announcement should have (and did) give plaintiffs reason to *suspect* that [the defendant] had lied to them, "it is not enough that [plaintiffs] had notice that something was awry; [plaintiffs] must have had specific knowledge of the actual breach of duty upon which [they sued]."

*Id.* (internal citations omitted) (emphasis in the original). Furthermore, the Court stated that to hold otherwise would impose a constructive knowledge provision to ERISA plaintiffs—a type of provision that had been explicitly excluded from the statute by Congress. *Id.* at 194 (citing H.R. 391, 100th Cong., 1st Sess.1987, *reprinted in*, 1987 U.S.C.C.A.N. 2313–1).

Instead, based on the law of fiduciary duty, the court held that "an ERISA plaintiff cannot be said to have 'actual knowledge of the breach or violation' until he has actual knowledge that his employer misrepresented a present fact or failed to disclose all material information known at the time of inquiry." *Id.* As to the claims brought in that case, the court found that the plaintiffs did not have actual knowledge of a breach of fiduciary duty until

they learned through trial testimony in a related ERISA case against the defendant that it knew about its plans to make a future offering at the time it was making contrary representations to its employees. *Id.* The Second Circuit, however, provided cautionary language in the midst of this conclusion. It noted that its holding was not intended to go so far as to mean that plaintiffs don't have actual knowledge until they learn of information that would normally be revealed through discovery. *Id.* 195. This would, of course, defeat the purpose of a statute of limitations.

This Court agrees with the Second Circuit that the statute of limitations should not be broadened to the point that employees can sue for breaches of fiduciary duty at any time. If the Court were to strictly construe the statute of limitations too harshly, however, it would create the opportunity for employers who breach their fiduciary duty to their employees through secrecy to commit not one, but two wrongs. Not only would they commit an ERISA violation, but courts would enable them to impair their employees' ability to bring an ERISA suit based on the employers' subterfuge.

■ Based on the guidance provided by *Caputo,* the Court finds that Plaintiffs in this case acquired actual knowledge within the three-year statute of limitations. As said in *Caputo,* just because an early retirement program raised Plaintiffs' suspicions at the time it was offered is not enough to constitute actual knowledge of a breach of fiduciary duty. Instead, they must have had some sort of specific knowledge that elevated their suspicion to actual knowledge. In this case, it was the Plaintiffs' exposure to some other information which made the Plaintiffs believe that NU had committed a breach of fiduciary duty. Plaintiffs universally stated that they were made aware of their potential claim after

either reading about similar claims in the newspaper or seeing an advertisement by Plaintiffs' counsel within the three-year statute of limitations. The fact that a few of the Plaintiffs consulted lawyers is of no consequence. Each time a Plaintiff consulted an attorney NU contacted the Plaintiff shortly after and assured the Plaintiff that there were no legal improprieties, thus diminishing any belief the Plaintiffs might have had a legal claim existed.

The Court finds that prior to the advertisements and newspaper articles, Plaintiffs did not have the actual knowledge to start § 413's statute of limitations. The court vacates its ruling to the contrary, and finds that Plaintiffs may pursue their claims.

## B. Six–Year Limitations Period

■ In the alternative, the Court finds that Plaintiffs may pursue their claims under the six-year statute of limitations because they have properly alleged fraud or concealment.

■ ERISA's statute of limitations provides that "in the case of fraud or concealment, [a breach of fiduciary duty action] may be commenced not later than six years after the date of discovery of such breach." Whether plaintiffs have adequately shown fraud is "relevant to when 'the action' may be timely brought, 'the action' itself is still one for breach of fiduciary duty." *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 282 (1992). In *Caputo,* the Second Circuit defined "fraud or concealment" as follows:

> [T]he six year statute of limitations should be applied to cases in which a fiduciary either: (1) breached its duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment; or (2) engaged in acts to

hinder the discovery of a breach of fiduciary duty.

*Caputo*, 267 F.3d at 190.

■ As to the first provision, the Court found that the elements of common law fraud are applicable. *Id.* at 188–93. These elements include: (1) a material false representation or omission of an existing fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance, (5) that damages plaintiff. *Id.*

■ Specifically, the Court found that information is material "if there is substantial likelihood" that a misrepresentation of future pension benefits "would mislead a reasonable employee in making an adequately informed decision about if and when to retire." *Id.* at 192 (citing *Ballone*, 109 F.3d at 123). As discussed later in this opinion, in this case NU intentionally withheld important information from its employees by virtue of its confidentiality policy. NU concealed information not only from its employees as a whole, but also from the human resources employees that were trained to provide benefits-related information. There is no question that this information was material. The failure to inform can constitute a material false representation in the same way as an affirmative misstatement, especially in the context of a fiduciary relationship. *Diduck*, 974 F.2d at 276.

■ In addition, "[t]o hold a defendant liable for fraud it must be shown that he acted with 'knowledge,' that is, he either knew of the falsity of the representations or believed them to be false." *Id.* This knowledge element cannot be demonstrated through negligent behavior, but may be met if a "defendant makes a representation with reckless disregard as to its truth." *Id.* In this case, the Court finds that the knowledge element has been met.

By limiting the information it provided to its human resources employees, NU guaranteed that the representations made to employees by the company would be incomplete. While incompleteness does not automatically constitute falsity, the confidentiality policy promulgated by NU certainly does show a "reckless disregard" for truth that satisfies the knowledge element of common law fraud.

In addition, the intent of NU's policy can be considered as an encouragement to employees to retire without waiting for an early retirement program to be released. While intent is difficult to prove, in this context the Court may infer intent because of NU's special relationship with Plaintiffs. The Second Circuit has said that the ordinary requirements for proof are relaxed when the fraud is alleged to have been committed by a fiduciary, as long as there is a "substantial certainty" that a nondisclosure would be relied upon by a plan beneficiary. *Id.* at 278; *see also Mathews v. Chevron*, 2002 WL 826804, *11, 2002 U.S. Dist. LEXIS 7738, *31 ("[U]nder ERISA, employers are deemed to intend the reasonably foreseeable consequences of their misinformation when that misinformation induces earlier than otherwise retirements."). In other words, a reasonably foreseeable consequence of the confidentiality policy—and resulting misinformation—was that employees who might otherwise delay their retirement would instead retire. This action would be to these employee's detriment, as they would forego inclusion in a forthcoming early retirement program.

The reliance element of fraud is essentially causation in fact. *Id.* Thus, NU's conduct need not have been the "exclusive inducing cause" of plaintiffs' actions, but only an "essential or inducing cause." *Id.* As discussed later in this opinion, the statements and/or omissions made by NU

to each Plaintiff was an "essential or inducing cause" of their retirement, notwithstanding the other life circumstances that contributed to their decision to retire.

Finally, the damage element has been met in this case, as each plaintiff who retired before the offering of an early retirement program suffered a monetary loss.

### III. FINDINGS OF FACT

At trial, the Court heard evidence on two general issues: first, the evolution of NU's early retirement programs; and second, the particular circumstances of each Plaintiffs' retirement from NU. The Court will now review its Findings of Fact on these issues:

#### A. Early retirement programs at NU

In 1987, NU was developing a strategy to prepare for the challenge of competition in a deregulated environment. NU concluded that to be financially competitive it should implement cost-saving initiatives, including contracting its workforce. In 1987, NU conducted a survey of downsizing techniques employed by other large companies. As a result of this survey, NU was presented with numerous cost-saving tools, including the implementation of early retirement programs. These type of programs were recommended to NU management as a way to meet their objective to reduce its employee base.

At this point, it might be helpful to briefly describe the concept of "early retirement programs." Various terms were used throughout trial to refer to these type of early retirement programs, such as "golden handshakes" or "special retirement programs" or "incentives." In essence, early retirement programs differed from "normal" retirement at NU in the following respects: employees were eligible for early retirement at age 55, while normal retirement eligibility began at age 65; and those taking early retirement would have a reduction to their accrued benefit based on early commencement of that benefit, while those taking normal retirement would get their entire accrued benefit.

The Court will also take this opportunity to outline NU's basic corporate structure vis-à-vis employee benefits. The corporate benefits section, a division of the human resources group, was responsible for the design and administration of benefits for NU, including early retirement programs. During most of the relevant time period, Keith C. Coakley ("Coakley") was the senior manager in the corporate benefits section. As such, Coakley was the senior manager at NU most responsible for retirement- and benefits-related work. Coakley's direct supervisor in 1991 was Cheryl Grise ("Grise"), who was then assistant vice president of human resources. At that time, Barry Ilberman ("Ilberman") was the vice president of human resources, and was supervised by NU president and chief operating officer Bernard M. Fox ("Fox"). Fox reported to William B. Ellis ("Ellis"), chief executive officer of NU and chairman of its board of directors. In May 1991, Grise assumed the post of vice president of human resources, replacing Ilberman. For some time before that, she had assumed Ilberman's supervisory duties with regard to employee benefits.

With that background in mind, the Court will now discuss NU's exploration of early retirement programs. NU was initially reluctant to offer early retirement programs because it believed that they were too costly, especially when compared with other options such as layoffs in its workforce. In June 1990, however, NU offered a limited early retirement program to 25 employees. In order to qualify for the June 1990 early retirement program,

an employee had to have at least ten years of service to NU, and had to be at least 55 years old. The June 1990 early retirement program included an additional five years of service, and an additional five years for pension calculations. Another feature of the 1990 early retirement program was a $550 per month "social security bridge" for those employees who had not yet reached the age of 62.

In late 1990 it was still a NU priority to cut costs. In early-December 1990, Coakley asked NU's actuaries, Towers–Perrin, to prepare a report on the potential costs of a system-wide early retirement program. The Towers–Perrin report, dated December 13, 1990, reviewed NU's June 1990 early retirement offering. In addition, the report responded to NU's request that Towers–Perrin review the cost of extending a similar program system-wide, including officers, employees exempted from the previous program, and clerical/technical employees of the entire company. The proposed eligibility for this system-wide program was those employees aged 55 and older with at least ten years of service. The proposed program included a monthly $550 "social security bridge" to age 62, and an additional monthly $275 social security bridge after age 62. In addition, the program included an addition of five years of service. The Towers–Perrin report assumed a 1991 offering date, included a suggested design for the program, discussed issues surrounding NU's capability to provide the program from the retirement plan, and estimated acceptance rates and pension costs. Listed as "next issues" in the report were: "resolve tax reform required changes, finalize program design, implement program (prepare communications materials, prepare individualized employee calculations, train counselors, hold employee briefings/Q & A sessions), amend plan, and determine financial impact."

Later in December 1990, Coakley made a presentation to the NU management committee, which focused on various cost-saving downsizing scenarios, including system-wide early retirement programs. The management committee consisted of NU's top executives, including Fox and Ellis. While Coakley does not recall presenting the actual Towers–Perrin report to the management committee during this presentation, Coakley referenced the report in his preparation for the meeting. During his presentation, Coakley presented six different downsizing options, four of which were various versions of early retirement programs. The remaining two options were both severance programs not tied to retirement.

Coakley's presentation of the four early retirement programs for employees included assumed acceptance rates, cost estimates with potential savings, descriptions of targeted employees, and early retirement net reduction calculations for various classes of employees. Of the four versions of early retirement programs offered by Coakley, two involved giving employees six months pay at retirement in a lump sum at retirement, while the remaining two offered three months pay at retirement in a lump sum. Finally, the four versions reflected variations of the categories of eligible employees.

In January 1991, Coakley followed up his December 1990 presentation to the management committee with a meeting with Fox. During that meeting, Coakley discussed the six downsizing options he had presented to the management committee, including both the severance alternatives and early retirement programs. With regard to the early retirement programs, Coakley's agenda with Fox included a discussion of issues such as social security supplements for those employees

past age 62, special incentives for employees with long years of service, legal issues related to extended periods, and the regrouping of various classes of employees. The materials prepared for the meeting included plan design materials, sample pension calculations, and detailed cost charts.

Soon after, Grise instructed Coakley to ask Towers–Perrin to do some development work for a possible system-wide early retirement program. Coakley instructed one of his employees, Paula Roberge ("Roberge"), to communicate with Towers–Perrin on this work. Roberge was a human resources representative and benefits analyst in the corporate benefits section. Roberge was supervised by Coakley, who testified that any communications Roberge had with Towers–Perrin were most likely passed by him as well.

From March 1991 through April 1991, Towers–Perrin was involved in developing an early retirement program. Towers–Perrin's documents reflect that in March 1991 NU was "considering" an early retirement incentive program which was expected to result in a one-time cost of about $25 million. During this same month, NU issued a "Confidential Position Paper" regarding the potential retirement of certain Fossil/Hydro units, which contemplated, among other things, an early retirement program for these employees, as well.

On April 20, 1991, Roberge discussed with Towers–Perrin a possible early retirement program that would be offered to NU employees on May 15, 1991 with an acceptance date of June 30, 1991. As of April 24, 1991, Towers–Perrin had prepared a detailed summary of the proposed early retirement program. The proposed program required an employee to be age 55 and have at least ten years of service with NU. It also included three months of severance pay, and the addition of five years of service and five years of age for pension calculations. In addition, it included a monthly $550 "social security bridge" to age 62. On April 29, 1991, Roberge sent a memo to Betsy Magnarelli ("Magnarelli"), an employee of Towers–Perrin, which indicated that NU was "finalizing" the details of this early retirement program, including the "titles and groups of employees to be offered this program." On that same day, Coakley sent a confidential memo to Grise about preparing communications with employees about the early retirement program, including sample text for these communications. On April 30, 1991, Roberge sent another memo to Magnarelli, which enclosed a "draft that [Coakley was] proposing for an early retirement program." According to Towers–Perrin records, Roberge reiterated that NU wished to release this program to employees by May 15, 1991.

In early May 1991, Roberge continued to communicate with Towers–Perrin about details of the program. During this month, employee communication materials were being finalized by NU and Towers–Perrin, and a "first draft" of the document employees were to be given was created. As of this point, however, NU had yet to receive final approval of the early retirement program. A May 3, 1991 memo from Roberge to Magnarelli mentioned that May 1, 1991 retirees would not be eligible for the early retirement program "since we have yet to receive a decision." Roberge relayed a similar message again on May 8, 1991, when she told Debbie Hart ("Hart"), another Towers–Perrin employee, that "we have not received the official word yet."

It appears that sometime around May 9, 1991, NU decided to put the early retirement program on hold. Roberge testified that in a May 9, 1991 phone call to Magnarelli, she told Towers–Perrin that the

program scheduled for June 30, 1991 was in a "holding pattern" because the "[Connecticut Department of Public Utility Control] [hereinafter "CDPUC"] would not believe the expense." Roberge did not have any personal recollection of this conversation, but instead based it on a "Chronology of Events" prepared by Towers–Perrin in preparation for this litigation. This chronology—apparently based on Towers–Perrin documents—reads as follows: "5/9/91. Note to file from [Magnarelli] regarding phone call with [Roberge]. Window no longer on for 6/30. In holding pattern. [CDPUC] would not believe expense." Roberge testified that it was "more probable than not that the comment about the expense was made to her by [Coakley] . . . and that [she] passed those words on to Towers–Perrin." Coakley did not disagree with Roberge's assessment.

No matter the cause, the record shows that NU's plan for the May 15, 1991 release of an early retirement program was in a "holding pattern" as of May 9, 1991. In terms of what this "holding pattern" meant, Coakley agreed that the holding pattern was similar to a plane circling an airport waiting to land. During the holding pattern, Towers–Perrin continued to work on program details. For example, on May 14, 1991, Towers–Perrin wrote to NU: "since most of the work on this portion of the package is behind us, we should be able to move quite quickly when you decide to proceed." On that same date, Towers–Perrin forwarded to NU a second draft of the plain language summary that employees would use with respect to the system-wide early retirement program. In addition, a coverage test was prepared by Towers–Perrin for the program on May 22, 1991. Coakley testified that the purpose of this work was to be prepared for the time when NU decided to proceed with the system-wide early retirement program. He explained that this advance work was

helpful, since human resources typically did not have much time to implement such programs once final approval was made.

On July 17, 1991, Roberge called Magnarelli to inform Towers–Perrin that "the open window [a euphemism for an early retirement program] seems to be on again, possibly effective 10/1/91." There is a dispute between the parties about which early retirement program Roberge was referring to when she made this statement. NU contends that during the time that the system-wide early retirement program was in a "holding pattern," Towers–Perrin continued to work on a smaller early retirement program for NU's Fossil/Hydro units. NU argues that in her July 17, 1991 telephone call, Roberge was referring to the smaller Fossil/Hydro early retirement program, not the system-wide early retirement program put on hold in May 1991.

In her affidavit of direct testimony, Roberge supports this interpretation. At trial, however, Roberge testified that she had no personal recollection of her conversation with Magnarelli. She explained that she formulated her affidavit of direct testimony based on the Towers–Perrin "Chronology of Events" document which was prepared by Towers–Perrin in preparation for this litigation. Similarly, while Coakley's affidavit of direct testimony offered the same interpretation of Roberge's statement, he testified at trial that he had no personal knowledge of Roberge's conversation with Magnarelli. In contrast to Roberge's and Coakley's suppositions about the July 17, 1991 conversation, Plaintiffs offered their own hypothesis—that Roberge was referring to the system-wide early retirement program.

The personal recollections of those involved in the July 17, 1991 conversation, or lack thereof, leave the Court with the job

of reaching the most logical conclusion about the meaning of Roberge's words to Magnarelli. After reviewing both parties' analysis, the Court concludes that the most likely scenario is that Roberge was referring to the system-wide early retirement program, rather than the smaller Fossil/Hydro program.

The Court reaches this conclusion for several reasons. First, it is only logical that the "on again" language would refer to an early retirement program that was once "off." In this case, only the system-wide early retirement program was in a "holding pattern." Coakley testified that work on the smaller Fossil/Hydro early retirement program had continued throughout the period the system-wide early retirement program was in a "holding pattern." Second, the circumstances of Roberge's employment with NU make it unlikely that she would communicate with Towers–Perrin about the smaller Fossil/Hydro program. Both Roberge and Coakley testified that they did not believe that Roberge had ever worked on the Fossil/Hydro program. Several other factors are of note. The Towers–Perrin memo indicates that the early retirement program referenced by Roberge would be "on again" as of October 1, 1991. This is the same date that the system-wide early retirement program was actually announced to employees.

The main contrary evidence is the testimony of Roberge and Coakley. This testimony was based not on their personal recollection, but almost exclusively on the "Chronology of Events," a document the Court deems inherently unreliable. This exhibit was not prepared contemporaneously, but rather prepared by Towers–Perrin for NU around the same time that this litigation was filed, five years after the events it purported to summarize. It was also prepared in anticipation of litigation, as reflected in the fact that it was faxed to NU's outside counsel, its counsel in this litigation, just one day after it was sent to NU. Absent these infirmities, the document is also unreliable because many of its statements contain several levels of hearsay, and the Court has not been shown its underlying documents.

Even if Roberge's and Coakley's reliance on this document, as opposed to their personal recollection, were reasonable, their conclusion is inconsistent with the rest of the document. In a later entry, dated August 20–23, 1991, it is indicated that the smaller Fossil/Hydro early retirement program was "back on." If the Court were to credit Roberge's and Coakley's speculation about the July 17 conversation, there would be two separate entries—one on July 17, 1991 and the other on August 20–23, 1991—which indicate that the Fossil/Hydro program was "back on." It does not make sense for there to be two entries, almost one month apart, indicating that Towers–Perrin had been told that the same early retirement program was "back on." In any event, to the extent that the Court must resolve the dispute about Roberge's July 17, 1991 phone call with Magnarelli, it resolves it as described above—that on July 17, 1991, Roberge told Towers–Perrin that the system-wide early retirement program was back "on."

No matter what Roberge said to Towers–Perrin on July 17, just a few days later Coakley suggested to Grise that NU offer "any [system-wide] one we might be considering for this year" concurrent with a Fossil/Hydro early retirement program in order to limit administrative costs. About one week later, Grise sent a memo to Fox relaying Coakley's suggestion. Consistent with his recommendation, on August 5, 1991 Coakley prepared timelines for both a Fossil/Hydro early retirement

program and a system-wide early retirement program. On that same day, Coakley met with Fox to discuss these possibilities.

At this point, the Court believes it would be helpful to discuss the role of the CDPUC in relationship to NU. The CDPUC had controls over the rates NU could charge its customers. NU believed that CDPUC decisions affected many of its operational decisions, especially those that would result in expenditures. This included the offering of an early retirement program. Throughout this time period, NU was negotiating a rate increase with CDPUC. In particular, in June 1991, NU took part in a series of hearings with the CDPUC with regard to its request for a rate hike. In early August, NU learned that the CDPUC had approved its rate hike. It is likely that during July and August 1991, NU was working on both the Fossil/Hydro and the system-wide program, as reflected in Coakley's suggestion to Grise and Fox. NU had a so-called "fire drill" contingency policy, whereby NU would do much of the preparation work for early retirement programs in advance so that NU could be prepared when the board issued its final approval. Coakley suggested at trial that the work being done by Towers–Perrin was "cannibalized" by one program for another. In other words, the general language and provisions which NU had been examining for one program could be used interchangeably with another program.

The record does show that on August 20, 1991, Diane Antoni ("Antoni") of Towers–Perrin spoke with Roberge, who indicated that the "window is back on with a 12/1/91 effective date. Provisions are the same but reasons are different than in May. The eligible group has changed from about 700 to 50 employees." This was likely in reference to the Fossil/Hydro program, which was offered to a much smaller employee population than the system-wide early retirement program. On August 26, 1991, Coakley presented the Fossil/Hydro early retirement program to the board of directors. On August 30, 1991, Towers–Perrin indicated that the "NUSCO open window project is on track once again." The program referred to in this memorandum involved fifty employees, and contemplated a late-August announcement date. Since the number of employees was so small, this comment was also most likely in reference to the smaller Fossil/Hydro program, not the system-wide early retirement program. Soon after, on September 11, 1991, Towers–Perrin sent Roberge a memorandum with sample statements for "the early retirement program." It assumed a December 1, 1991 retirement date. On September 16, 1991, employees eligible for the Fossil/Hydro early retirement program received packets in the mail.

On September 17, 1991, Magnarelli drafted a memorandum to other Towers–Perrin employees which stated that NU may offer a "new open window" for approximately 500 employees, with a retirement date of December 30, 1991. The memo indicated that Roberge had sent to Magnarelli a description of the program which "has some changes from last time." The memo indicated that the final decision on the program would be made on September 30, 1991, and that packets would go to employees on October 1, 1991.

From mid- to late-September 1991, Roberge and Towers–Perrin worked on specifications of the program, including lists of eligible employees and drafts of materials. On September 18, 1991, Roberge sent Magnarelli a list of those individuals who would be eligible for the "next program." On September 23, 1991, Coakley met with his staff to discuss employee financial

counseling in relationship to these early retirement programs. In late-September 1991, various drafts of the program were exchanged between Towers–Perrin and Roberge. Finally, on September 30, 1991, Coakley presented the system-wide early retirement program to the board of directors, and it was approved. The program was announced to employees on that same day, with a response date of November 18, 1991, and a retirement date of December 31, 1991.

In order to be eligible for the 1991 early retirement program, employees had to have at least ten years of service with NU. For those employees who decided to retire by December 31, 1991, the early retirement program provided to eligible employees a benefit calculation that included a "bonus" of five additional years of service that would lead to benefits being calculated as if the employee were five years older than he actually was. If an employee was younger than age 62 when he retired, he would also receive a "social security bridge" of $550 a month. Employees also had the option to let NU set a retirement date for them prior to December 31, 1992, rather than accept the December 31, 1991 date. If an employee chose this option, the employee would receive an additional lump sum payment of three months base pay. Of the 631 employees eligible for the 1991 early retirement program, 438 accepted.

During the next few years, NU continued to consider efforts to improve its financial condition. NU had set a goal of reducing its workforce by approximately 800 employees, and thus NU had to reduce its workforce by approximately an additional 400 employees.

Sometime in 1992–1993, NU began what was called the "Competitive Preparedness Review" ("CPR"). CPR was focused on NU's Fossil/Hydro organization. The final presentation to the CPR steering committee was made on April 14, 1993. One of the primary recommendations to the CPR steering committee was the implementation of an early retirement program. On May 12, 1993, the final report of the CPR was issued. This report included a summary of an early retirement option, which included cost analysis. The goal was to implement the early-retirement program "near term," and impact 1994 budgets. There were other ideas that were "immediate," and would impact 1993 budgets.

In a memo written by Towers–Perrin on June 15, 1993, Towers–Perrin discussed numerous details of this early retirement program, and indicated that non-discrimination tests were being performed. On June 28, 1993, Roberge sent a memo to Towers–Perrin which indicated that only minor changes would be made to the materials Towers–Perrin and NU had prepared for the 1991 offering. On June 30, 1993, Roberge wrote a memo to Towers–Perrin which indicated that it was "a go" for an early retirement program.

By early July 1993, target announcement and retirement dates for various types of NU employees were listed, the eligible employees had been defined, and a budget had been set up for all program-related costs. By July 13, 1993, drafts of the offering materials were distributed to NU by Towers–Perrin. On July 23, 1993, a "final" draft of the program was developed, with regard to which Roberge indicated "everything is fine." All materials were scheduled to be ready by July 29, 1993, when envelopes would be collated and stuffed, with July 30, 1993 as the targeted mailing date. On July 30, 1993, the board of directors adopted the 1993 early retirement program. It was announced to employees on August 3, 1993. Materials had been mailed a day earlier.

In June 1994, Coakley drafted a memorandum indicating that NU was considering other force reduction programs that would be targeted at a younger population of employees, since NU needed "to retire as many people as possible." In June 1994, Coakley recommended that NU follow the "current design" for a program. Soon thereafter, in July, August, October and November, 1994, various early retirement programs were announced by NU. On October 24, 1994 the board of directors approved an early retirement program, and on the following day, October 25, 1994, the early retirement program was announced to NU employees.

The documentary evidence NU produced in discovery regarding the early retirement programs, but especially the 1993 and 1994 programs, is limited. NU retained the final versions of some plan and program documents, but generally not correspondence or drafts leading to those final versions.

## B. NU's confidentiality policy and communication procedures

The testimony at trial indicated that during this entire time period NU had a policy that any discussion of early retirement programs was to be kept confidential until the programs were formally announced. Grise testified that "information relating to the development of early retirement projects was maintained in the strictest confidence until a program was finally approved and implemented." By "approval," Grise meant approval by the board of directors and/or chief executive officer Ellis. Grise testified that "[u]ntil a decision had been made to offer an early retirement program, we did not disclose to employees or to anyone else whether we were considering a potential design of an early retirement program or whether to offer such a program."

Coakley testified that Grise instructed him to perform any work on downsizing scenarios "confidentially" and to "disclose it on a need-to-know basis." Coakley testified that "to the extent that [his] subordinates were involved, [he] asked them not to share their developmental work with anyone until there was a final approval of an actual program by [NU], as it was the policy of [NU] that until such approval, information concerning the internal consideration or the development of any downsizing project, including early retirement, was maintained confidential." As Coakley wrote in an internal NU memorandum: "Decisions to offer early retirement programs and/or involuntary termination programs are made at the highest levels of management and maintained in the strictest of confidence until approval and implementation. Until approved and announced, no one within the Company is authorized to represent that such programs will or will not be offered." Coakley described the situation this way: until an early retirement program was approved by the board "we really didn't have a program."

Consistent with this policy, members of the NU human resources group, including corporate benefits counselors such as Turner, were not made aware of the development of offerings, even though Turner and those like him were considered the preferred resource available to NU employees to obtain information about their retirement. Even if corporate benefits counselors were somehow made aware of the development of any early retirement program, they were instructed to follow NU's confidentiality policy with regard to these programs, and thus not share the details with NU employees.

These type of human resources counselors were an integral part of NU's benefits structure. NU's position was that employ-

ees were generally advised that their supervisors did not know of potential changes to employee benefits, and that they should instead contact the human resources department with any retirement- or benefit-related inquiries. At trial, the Plaintiffs did not disagree that the human resources department, and those such as Turner, were the most appropriate contact for these type of inquiries. Plaintiffs consistently testified, however, that NU encouraged employees to speak first with their supervisor, who then might refer them to human resources if he could not assist the employee. In particular, Plaintiff Robert L. Klein ("Klein"), a mid-level management employee, testified that he was charged with explaining some human resources policies to his employees. Klein testified that if he couldn't answer a particular human resources-related question posed to him, he would then refer the employee to the human resources department.

### C. Plaintiffs' retirements

The Court will now discuss the details of each Plaintiffs' retirement.

#### 1. Paul Broga

Paul Broga ("Broga") retired on February 1, 1993 at age 55, after 33 years at NU. On August 24, 1992, Broga first indicated to Turner that he intended to retire effective February 1, 1993. In November 1992, Broga met with Turner to discuss his retirement. Broga brought up the topic of early retirement programs, and Turner responded that "there was nothing coming down the pike." That same month, Broga also approached his supervisor, who was a senior company manager, with similar questions. His supervisor said that he was not aware of any program being offered in the future. Broga asked similar questions of other NU employees, supervisors and

senior company managers in January 1993, and received similar responses—that they knew nothing about any such programs.

Several factors led to Broga's decision to retire. At the time of his retirement, Broga, although ten years younger than his wife, had some heart problems. He was aware that the release of an early retirement program in the future was possible, but testified that if in January 1993 he had known that the company was thinking about offering an early retirement program, he would have delayed his retirement. He testified that he felt that he had a good job, and was content to stay as much as a year longer.

In September 1993, after his retirement, Broga found out about the 1993 early retirement program. While he was upset, he did not realize that a legal wrong had been committed, and did not retain legal counsel and file a claim until several years later.

#### 2. Robert Gamache

Robert Gamache ("Gamache") retired on July 1, 1993 at age 58, after 27 years at NU. In Fall 1992, Gamache asked Turner about retiring. In May 1993, Gamache asked Turner about the possibility that an early retirement program would be offered. Turner said that he didn't know of anything.

Gamache testified that at this time of his retirement, he was "fed up" with his co-workers and had effectively "thrown in the towel" with his work at NU—all factors which led to his retirement. Gamache understood that anything was possible in the future, and that he was taking a risk by leaving. Gamache testified, however, that if NU had told him it was considering offering an early retirement program, he would have stayed. He testified that if it was clear to him that the company really didn't know what it was going to do in the future—there was no specificity or defi-

niteness—then he would have continued with his plans for retirement.

After his retirement in July 1993, Gamache ran into a former NU co-worker, who told him about the 1993 early retirement program offered by NU. Gamache was angry, but did not contact a lawyer until several years later, when he saw an advertisement by Plaintiffs' counsel seeking former NU employees.

### 3. Alfred Goncalves

Alfred Goncalves ("Goncalves") retired on June 1, 1991 at age 55, after 36 years at NU. Goncalves began discussing his retirement with Turner in January 1991, and confirmed his intent to retire in February 1991. On April 22, 1991, Goncalves and his wife met with Turner to discuss his retirement plans. During this meeting, Goncalves asked Turner if there were going to be any early retirement programs coming in the near future. Turner replied that he did not know of any such incentive being offered in 1991 or in the foreseeable future.

Shortly before his retirement, Goncalves was a supervisor for overhead lines at NU—a position that did not involve any physical labor. While Goncalves suffered from knee, neck and back problems at this time, he testified that these problems did not prevent him from performing the duties of this supervisory position. Even still, in an October 1991 letter to Coakley, Goncalves wrote that his retirement was due to "excruciating pain" in his knees. Goncalves wrote to Coakley, and reiterated during his testimony, that he made the decision to retire after deciding not to pursue a disability. While Goncalves had accrued enough sick leave at the time of his retirement so that he could have had corrective surgery and stayed out of work at full pay for several months afterwards to recuperate, Goncalves testified that he

did not go this route: "I figured I would keep working as long as I could and when I retired, that's when I would take care of my knees instead of sick leave and getting paid while doing nothing. I tried to be productive. I just didn't want to take six months off, be on the payroll and be like dead weight at the company." Goncalves testified, however, that if he had known an early retirement program was being considered by NU at the time he had scheduled his retirement, he would have had the operation, recovered for six or seven months, and then come back to work to see if any early retirement program was being offered. Goncalves testified that if he found out upon his return there was still nothing definite, he would have continued with his plans for retirement.

In December 1991, Goncalves learned of the 1991 early retirement program while reading an article in a local newspaper. After reading the article, Goncalves was concerned that he had been misled. Goncalves wrote letters to Coakley and to Fox. In his letter to Fox, Goncalves indicated that if he wasn't included in the October 1991 offering he would seek legal advice, because he believed that he might have some sort of legal claim. In his February 1992 response to Goncalves, Fox indicated that "there were no plans or decisions to offer [an early retirement program] at the time you retired. Therefore, your management was correct in telling you that there were no plans to offer an early retirement program at the time of your retirement." Based on Fox's representations, Goncalves did not seek any legal advice at the time, because he did not believe that there was any legal remedy for his situation. It was not until several years later, after reading an article in a business magazine about similar suits about the duty of employers to be truthful under similar circumstances. After this,

Goncalves realized that he could actually pursue a legal claim against NU.

### 4. Michael A. Iavarone, Sr.

Michael A. Iavarone, Sr. ("Iavarone") retired on February 1, 1991 at age 57, after 32 years of service. In April 1990, Iavarone wrote a letter to Turner asking various questions about his retirement. Thereafter, Iavarone spoke with Turner to follow up on these questions. In mid-October 1990, Iavarone spoke with a supervisor, Stuart Coman ("Coman"), who said the "door was closed" on any future offerings. A few days later, on October 17, 1990, Iavarone wrote a letter indicating his intent to retire in February 1991. Iavarone followed up this letter with a December 6, 1990 meeting with Turner. During this meeting, Iavarone relayed Coman's statements to Turner in order to verify them, saying that it was "too bad" there was no early retirement program of which he could take advantage. Turner was silent on the issue. At the time of his retirement, Iavarone felt that his job was becoming stressful, and so he went ahead with his retirement plans.

Iavarone found out about the 1991 early retirement program in October 1991. He was angry when he heard about it, but he did not think that there was anything he could do. He did write a letter to Fox, however, who responded on October 22, 1991. Fox wrote to Iavarone that "there were no plans or decisions to offer [an early retirement program] at the time you retired. Therefore, your management was correct in telling you that there were no plans to offer an early retirement program at the time of your retirement." Based on Fox's statement, Iavarone did nothing. In 1996, Iavarone ran into a friend who told him about an advertisement she'd seen in the newspaper. This advertisement, sponsored by Plaintiffs' counsel, sought former NU employees who had not been offered an early retirement program.

### 5. Robert L. Klein

Robert L. Klein ("Klein") retired on April 1, 1991 at age 55, after 31 years of service at NU. As early as June 1989, Klein surveyed Turner about his different retirement options, based on the age of retirement and up to age 65. Around this same time, Klein asked his direct supervisor, vice president of customer service Raymond Donovan ("Donovan"), personnel manager Michael Brown ("Brown"), and senior vice president Frank Locke ("Locke") about retirement options at NU. Klein remembers that Donovan replied that he "didn't know" about any early retirement programs coming up in the near future. Klein also remembers speaking with Fox about retirement at NU, although he does not recall the time or place. Klein does remember that Fox told him that he should not delay his retirement because NU was not planning to offer an early retirement program. Klein testified that this was consistent with what he, as someone with management responsibilities, had been "conditioned" to tell his employees: not to hold off retirement.

On March 31, 1990, Klein took a leave of absence from NU. He was age 54 at the time. In preparation, Klein wrote a memorandum to NU outlining the terms of his leave of absence. According to this memorandum, the leave was scheduled to run from March 31, 1990 through approximately February 20, 1991. On February 20, 1991, Klein would benefit from unused vacation, which would take him through March 31, 1991. Klein indicated that it was his "intention" to retire thereafter, on April 1, 1991.

During Klein's leave of absence, he and Turner continued to correspond about retirement related issues. In February and

April 1991, Klein contacted Turner about rumors he had heard about NU's plans to offer early retirement programs in the near future. Turner did not provide any information to corroborate these rumors. Upon the expiration of Klein's leave of absence on March 31, 1991, he retired, as provided in his memorandum.

At the time of his retirement, Klein's wife was working in Minnesota. (This was one of the reasons that Klein had pursued a leave of absence). Klein sold his Connecticut home in December 1991, although the house was on the market sometime before the sale date—but then withdrawn because of the state of the real estate market at that time. Klein and his wife lived "on and off" in Minnesota until Fall 1995, when his wife was appointed to an academic position in Connecticut. Klein testified that he and his wife's plans always involved a return to Connecticut.

Even under these circumstances, Klein testified that he would not have done anything to jeopardize his retirement. In fact, Klein said that he was "uncomfortable" about retiring when he did, especially when he was not under any pressure to retire. Klein told the Court that if he knew in April 1991 that NU was "simply thinking about offering something in the future," he could have delayed his retirement and gone into a "wait and see" mode. Klein testified that there was little risk in him waiting, since he was still young and active. Klein also believed that he could have "reneged" on his memorandum stating his intention to retire in April 1991, since he was told that he could pull any retirement papers up until his retirement date. Furthermore, despite the geographic separation between he and his wife, Klein could have continued to travel back and forth between Minnesota and Connecticut if he had decided not to retire in April 1991.

Klein learned of the 1991 early retirement package in November 1991. While he was upset, he did not believe that he had a legal claim. He did not contact a lawyer until he read an advertisement by Plaintiffs' counsel indicating that he might have a legal claim.

### 6. Robert LaPorta

Robert Laporta ("Laporta") retired on February 1, 1991 at age 62 after 41 years at NU. In November 1990, Laporta expressed his intention to retire the following February. In reality, Laporta stopped working in November 1990, exercising his right to take seven or eight weeks of vacation time up to his retirement date of February 1, 1991. Before he began his vacation time, however, Laporta ran into Bill Wilson ("Wilson"), a fellow NU employee. On November 15, 1990, Wilson said to Laporta while passing him in the hall, "how would you feel if you retired and then they came out with [an early retirement program]." Laporta did not put too much stock in Wilson's statement, but it was on his mind when he met with Turner four days later. Because of Wilson's statement, Laporta asked Turner if it would be to his benefit to stay longer at NU and delay his retirement. Laporta specifically mentioned the rumors he had heard about early retirement incentives at NU. Turner did not confirm these rumors, but told Laporta that he had the right to change his mind about retirement up until the day he retired. Laporta also testified that in late 1990 a memo "came across his desk" where Fox reportedly said there would be no early retirement program. While this was a "big factor" in Laporta's retirement, this memorandum was not produced at trial. Based on Turner's response, Laporta confirmed his intent to retire on February 1, 1991, and began his vacation time.

Laporta's decision to retire in February 1991 was not the first time he had considered retiring. Laporta had settled on a December 1990 retirement date once before, but had changed his mind. Laporta said that he was flexible about retirement, which led to these adjustments. Based on his past experience, Laporta knew that he could have easily changed his retirement date if he felt there were early retirement programs coming in the future. If he had known more, Laporta would have delayed his retirement for at least three to six months, "maybe longer." While "maybe longer" is not particularly specific, in his deposition (which was read during his testimony) Laporta said that he believed he would have waited eleven or twelve months longer.

Laporta learned of the 1991 early retirement program in October 1991. He was upset, and called Turner to ask if he could benefit from the offering. Turner told him that he could not benefit from the 1991 early retirement program, and Laporta believed that he had no other recourse. It was not until several years later that Laporta spoke with Plaintiffs' counsel, and learned that he had a potential claim.

### 7. *Donald M. Lawyer*

Donald M. Lawyer ("Lawyer") retired on August 1, 1994 at age 55, after 24 years at NU. Lawyer began thinking about retiring in 1993. In July 1993, Lawyer wrote a memo to Turner, asking him if he would benefit from a delay in retirement. Turner did not respond. Soon after, Lawyer sent a similar letter to Coakley, but got no response. On August 25, 1993, Lawyer sent a letter to his supervisor about retirement. In this letter, Lawyer offered to take an unpaid leave of absence, believing that it would help NU with staffing problems. Lawyer's offer was contingent on the fact that he would not be excluded from any early retirement programs that might be offered by NU in 1994. In response, Lawyer's supervisor told him that he did not know of any early retirement programs. Lawyer wrote a similar letter in September 1993, indicating that he'd hold off retirement if an early retirement program was going to be offered. Again in February 1994, Lawyer sent a letter to his supervisor which indicated that he intended to retire on September 1, 1994, unless an early retirement program was being offered in the near future. Lawyer sent a similar letter to Coakley in March 1994. Coakley and/or the benefits department responded to Lawyer's letter, and suggested that there would be no additional benefit if Lawyer delayed his retirement to November 1, 1994. Accordingly, on May 19, 1994, Lawyer submitted his formal retirement notice to his supervisor, which was eventually adjusted to August 1, 1994. On this same date, Lawyer met with a personnel manager, Jim Dwyer ("Dwyer") who similarly responded to Lawyer that he was not aware of any early retirement program.

Even after this formal retirement notice was filed, Lawyer continued to speak with NU officials about early retirement programs. He spoke with Robert Busch ("Busch"), the president of CL & P, about the possibility of an early retirement program. He specifically asked him if NU had been studying or considering an early retirement program. In response, Busch said, "I don't know anything and I wouldn't be able to tell you, even if I knew of something." On June 27, 1994, Lawyer met with either human resources employees Roberge and Sharon Fournier ("Fournier"), and they similarly said that they hadn't heard of anything. Lawyer asked similar questions of Dwyer, Roberge, Fournier, his supervisors, human resources and other NU employees in July

1994, and up until the date of his retirement in August 1994.

At the time of his retirement, Lawyer had tired of the increasing pressure of his job, and the changing culture at NU. Although the culture improved closer to his retirement, he still decided to go through with his decision to retire.

### 8. Lawrence B. LeBrun

Lawrence B. LeBrun ("LeBrun") retired on July 1, 1991. Since LeBrun was gravely ill at the time of trial, his wife Marion LeBrun ("Mrs. LeBrun") offered testimony, as she was present at several of her husband's meetings with NU human resources personnel. In addition, LeBrun's deposition testimony was offered. At the beginning of his testimony, LeBrun discussed his medical condition, including some issues with short-term memory loss. Nevertheless, he outlined his work at NU and the relevant events throughout the deposition. Where he suffered from some memory problem in relevant testimony, the Court will note it.

LeBrun began to think about retiring several years before his actual retirement, but his first serious inquiries began about a year before his retirement, on or about July 1990. He first spoke to his supervisor, Leroy Muller ("Muller") about the possibility of an early retirement program. Muller said that he didn't know of anything coming in the future. On March 26, 1991, LeBrun wrote Muller to indicate that he planned to retire effective July 1, 1991. A few months later, on May 31, 1991, LeBrun and his wife met with Turner to discuss retirement options. At that time, LeBrun asked Turner about the possibility that NU would offer an early retirement program in the future. LeBrun was nervous about retiring, and wanted to know more before he "signed his life away." Turner told Mr. and Mrs. LeBrun that to his knowledge, there would be nothing in the foreseeable future.

LeBrun was asked at his deposition whether if he knew that he could continue working at NU for a longer period of time in order to receive a better retirement package, would he have continued working in order to receive the better retirement package. He responded, "I don't know. Yes, because what they offered me, they were making up the money that I was going to lose. That enhanced the retirement plan. That's all I can remember." This followed a discussion where LeBrun said that he considered the retirement package he did receive as quite favorable. Later in the deposition, when asked whether he would have stayed four months longer, he said "I don't know." He did testify, however, that there was no reason why he could not continue working past July 1, 1991.

### 9. Edward W. Lemay

Edward W. Lemay ("Lemay") retired on June 1, 1993 at age 55, after 30 years at NU. On February 3, 1993, LeMay wrote to Turner, and indicated that he intended to retire on June 1, 1993. Lemay spoke with Turner in February and March 1993 about these retirement plans. During these conversations, Lemay asked Turner about the possibility that NU might offer an early retirement program in the future. Turner said that he was not aware of any early retirement packages that might be offered in the near future. Lemay asked these same questions of Turner in the months before his retirement date, March and April 1993, but received the same response. During these same months, Lemay spoke to his supervisor and an officer of NU, Vice President Richard Carella ("Carella") neither of whom had any information about forthcoming early retirement programs. Since these responses were so

consistent, Lemay decided to go ahead with his retirement.

If Lemay had known that NU was thinking about offering an early retirement package at the time he retired, he would have delayed his retirement a few months. His wife did not retire until September 1993, and so he would have waited at least that long.

In August 1993, Lemay found out about the 1993 early retirement program. He was upset, but didn't believe that he could do anything about it. He called human resources and got the relevant information, but felt that he had simply lost out. It was not until he saw an article in the newspaper that he felt that he could sue NU, and that employers had a duty to be truthful about this type of information.

### 10. Armand L. Normandy

Armand L. Normandy ("Normandy") retired on May 1, 1991 at age 55, after 34 years at NU. Normandy had been thinking about retirement since he was in his 40s. In January or February 1990, Normandy attended a meeting presided over by Fox. Based on what he heard at that meeting, Normandy understood that NU was not going to offer any early retirement programs. On January 30, 1991, Normandy wrote a letter to Turner which indicated his intent to retire in May 1991. Thereafter, on February 15, 1991, he and his wife met with Turner. Normandy asked Turner if he should wait to retire in case an early retirement program was offered. Turner said that no such program would be offered. Normandy asked similar questions of Carella and his supervisor, Joseph Hyland ("Hyland"), since he often asked Hyland about retirement-related issues. Hyland and Carella had no relevant information.

At the time of his retirement, Normandy was partially disabled from an accident.

In addition, his wife was dealing with some health issues at the time. He thought it best to retire to Cape Cod, Massachusetts with his wife. If he had known that NU was considering an early retirement incentive offering, he would have waited "a couple months ... [i]f nothing happened, ... a couple more," despite these circumstances.

Normandy found out about the 1991 early retirement program soon after it was announced. Normandy was upset, and felt like he had been misled. In late-October 1991, Normandy wrote letters to NU officials expressing his concern. On November 19, 1991, Grise responded to one such letter she received, as did Ellis on December 3, 1991. Ellis told Normandy: "there were no plans or decisions to offer [an early retirement program] at the time you retired. Therefore, your management was correct in telling you that there were no plans to offer an early retirement program at the time of your retirement." Based on these representations, Normandy did not contact a lawyer. He did not realize he might have a legal claim until he saw an ad from Plaintiffs' counsel in the newspaper, and read an article about similar claims.

### 11. Donald L. O'Kane

Donald A. O'Kane ("O'Kane") retired on August 1, 1991, after 39 years at NU. Since 1993, O'Kane has suffered from a medical condition which results in a loss of memory. He is treated by medication for this condition. While this condition affected his testimony at trial to a small degree, the Court notes that he was able to recollect his time at NU in surprising detail, despite this condition.

O'Kane had been thinking about retiring since the late 1980s or early 1990. In August 1990, O'Kane wrote a letter to NU which requested information about retire-

ment. On August 30, 1990, he met with Turner about the contents of that letter. The principal reason for O'Kane's meeting with Turner was to discuss a future change in NU's medical benefits. During this conversation, however, O'Kane also asked Turner if NU was going to offer an early retirement package. Turner told O'Kane that NU's medical benefits were going to change for the better, and thus advised O'Kane that it was in his best interest to hold off his retirement.

In 1991, O'Kane had another conversation with Turner, during which they discussed the topic of early retirement incentives. Turner stated that he was not aware of a future offering of any such incentives. On April 29, 1991, O'Kane wrote Turner to inform him that he would retire effective August 1, 1991. Right before his retirement, on or about July 31, 1991, O'Kane spoke with Ilberman, the vice president of human resources, and asked him about the possibility of an early retirement program. Ilberman responded that NU was going to address its financial difficulties by attrition, not by an early retirement incentive because such programs were too expensive. During the last few weeks of his employment, O'Kane also spoke with other NU employees about the possibility of early retirement programs. All indicated that they had not heard of any such incentive program. O'Kane testified that if he had known that NU was considering an early retirement incentive at the time he retired, he would have stayed until at least the end of the year, approximately three months.

Soon after his retirement, O'Kane learned of the 1991 early retirement program and consulted with an attorney. As a result of his meeting with an attorney, O'Kane sent a letter to Grise. On November 22, 1991, Grise responded by saying that "there were no plans or decisions to offer [an early retirement program] at the time you retired. Therefore, your management was correct in telling you that there were not plans to offer an early retirement program at the time of your retirement." It was not until later on, when O'Kane received a letter from a friend about a successful case Plaintiffs' counsel litigated against Pfizer, and he reviewed some newspaper articles, that O'Kane realized that he could successfully bring a claim against NU.

### 12. Daniel M. Pennella

Daniel Pennella ("Pennella") retired on July 1, 1991 at age 62, after 44 years at NU. In late 1990 and early 1991, Pennella asked some questions about the possibility of early retirement programs of other NU employees, including his supervisor and other managers. All responded that they were not aware of any such program. Pennella had a telephone conversation with Turner in January 1991, during which he asked if NU was considering an early retirement program. Turner said he was not aware of any such offering. On April 29, 1991, Pennella and his wife met with Turner. During that meeting, Turner again reiterated that he had not heard of any such program.

Pennella could have waited up to six months to retire if he had known there was a possibility of an early retirement program. He would have asked additional questions and sought additional information in order to decide how much longer to wait. He believed that he would have waited three to six months longer.

Pennella learned of the early retirement program in September or October 1993. He was angry, but didn't believe that there was anything he could do. It was not until he read some articles in 1995–96 that discussed duties of employers that he knew he could sue.

### 13. Arthur E. Reil

Based on the Court's earlier evidentiary rulings, Plaintiffs offered little, if any admissible evidence about the circumstances of Reil's retirement.

### 14. Alphonso L. Riccardelli

Alphonso L. Riccardelli ("Riccardelli") retired on March 1, 1991 at age 65, after 39 years at NU. Riccardelli had been thinking about retiring for eight years. On August 8, 1990, Riccardelli signed a letter which indicated that his retirement would take effect on March 1, 1991. In Fall 1990, he spoke with William Burdick, a personnel manager, who said that he was not aware of any early retirement program, and that job reduction would be done by attrition. In December 1990 and February 1991, Riccardelli met with Turner about his retirement plan. Turner told him that he didn't know about any forthcoming early retirement programs. Riccardelli asked similar questions of his supervisor, who responded in the same way as Turner.

Riccardelli testified that he was "in no hurry" to retire, and had in fact "reneged" on retirement letters in the past. He knew that he could change his mind up until his retirement date. Riccardelli testified that if NU had given him any inclination that there was "something in the winds," he would have stayed at NU past his retirement date, for around a year, even if NU's plans were not definite.

After his retirement, Riccardelli heard about the early retirement program offered by NU in 1991. He was upset, and wrote letters to Turner and Fox. Fox replied that "there were no plans or decisions to offer [an early retirement program] at the time you retired. Therefore, your management was correct in telling you that there were no plans to offer an early retirement program at the time of your retirement." Riccardelli still felt that he had been mistreated, but didn't know what to do about it. In 1995 or 1996 he read an article about the duties of employers and realized he may have a claim.

### 15. Mary Roberge

Mary Roberge ("Roberge") retired on March 1, 1991 at age 62, after 21 years at NU. Roberge started to think about retirement some time earlier. She asked questions in 1990, and again in late-January 1991 of her supervisor, who she believed was a proper source of information. In February 1991, Roberge spoke with Marty Terry, a human resources employee at her office about her retirement. Roberge asked Terry about the possibility of an early retirement program, but Terry said that she didn't know of any early retirement programs in the works. After these conversations, she believed that there was no information about early retirement programs, and that she should go ahead and retire. On February 11, 1991, Roberge met with Turner. He said that he didn't know anything about a forthcoming early retirement program.

Roberge didn't find out that an early retirement program was offered in 1991 until another NU employee told her about it and a television program she saw about it. In her affidavit of direct testimony, Roberge recalled the specifics of this conversation, and indicated that it was in 1996. In her cross-examination, she was not as specific, simply saying that it was sometime between 1991 and May 1996. She did say that on May 7, 1996, she met with Turner, who confirmed that the program had been released, and mentioned that a suit was being brought. Afterwards, Roberge first learned of other similar suits that had been brought on similar grounds.

### 16. William Schreindorfer

William Schreindorfer ("Schreindorfer") retired on May 1, 1991 at age 60, after 35 years at NU. In January or February 1990, Schreindorfer attended an informational meeting with Fox. Fox said that there was not going to be an early retirement offering because it was not beneficial to the company or the employees. Schreindorfer had been planning to retire for some years, and thus went ahead with his retirement plans. In a letter dated January 29, 1991, he indicated that he intended to retire. Thereafter, he spoke with his supervisor, who didn't have any information about early retirement programs. In March 1991, Schreindorfer and his wife met with Turner. When Schreindorfer asked Turner about early retirement programs, Turner said there was no available program, and if there was, it wouldn't affect him.

He was settled in his Connecticut home at the time of his retirement (he still lives there) and would have delayed his retirement if he knew that an early retirement program was possible.

It was not until December 1991 that Schreindorfer found out about the 1991 offering. He called NU to complain, and received a letter back from Fox which indicated that "there were no plans or decisions to offer [an early retirement program] at the time you retired. Therefore, your management was correct in telling you that there were no plans to offer an early retirement program at the time of your retirement." He did not realize that he might have a claim until he read an article in 1995 concerning a Pfizer case where the employer was not truthful to employees.

### 17. Viola Sorensen

Based on the Court's earlier evidentiary rulings, Plaintiffs offered little, if any ad-missible evidence about the circumstances of Sorensen's retirement.

### 18. Eugene F. Sturgeon

Eugene F. Sturgeon ("Sturgeon") retired from NU on April 1, 1991 at age 62, after 35 years at NU. In December 1990, Sturgeon attended a meeting with Fox and Ellis. At that meeting, Sturgeon believed that Ellis indicated that NU was not going to offer an early retirement program. Sturgeon went ahead with his retirement plans. Right before his retirement, Sturgeon spoke with his supervisor, senior vice president Frank Kinney ("Kinney"), about any early retirement programs. Sturgeon believed that Kinney was a better source for this information than human resources employees, since Kinney was an officer of the company. Sturgeon had a close relationship with Kinney, and they often spoke about corporate policy. Kinney told Sturgeon that he didn't know of any early retirement programs. In conversations with Turner, what Kinney said was confirmed.

At the time of his retirement, Sturgeon was uncomfortable about NU management and was concerned about stress on the job. Sturgeon knew his job would be in good hands, since he had been training a replacement for his position since the late–1980s. Even still, if Sturgeon had known that the company was considering an early retirement program, he would have delayed his retirement. Sturgeon testified that he would have waited to get more information, certainly up to the time he reached age 65, and definitely past October 1991.

In September or October 1991, Sturgeon found out about NU's 1991 early retirement program. While he was upset, he didn't know that he had the right to sue, or that he had any other alternative. He did

write a letter to Fox in late-November 1991. Fox responded in mid-December, 1991, and told Sturgeon that "there were no plans or decisions to offer [an early retirement program] at the time you retired. Therefore, your management was correct in telling you that there were no plans to offer an early retirement program at the time of your retirement." In 1995, Sturgeon saw an ad from Plaintiff's counsel, and answered it.

### 19. Constantine Ventsias

Constantine Ventsias ("Ventsias") retired on March 1, 1991 at the age of 60, after 36 years at NU. Ventsias had made his retirement plans in April 1990. Ventsias spoke with his supervisor in November 1990 about the possibility of an early retirement program at NU. His supervisor said that while there was a discussion about an early retirement program among management, there was no definite decision, and left Ventsias with the belief that nothing would be offered. On January 22, 1991, Ventsias and his wife met with Turner to prepare his retirement papers. Ventsias asked Turner to let him know about anything in the future that might affect his retirement, since he was aware that he could change his mind about retirement at any time up to his official retirement date. Turner didn't say, then or later, anything about the possibility of an early retirement program.

If Turner had said that the early retirement programs were being looked at, he would have delayed his retirement and stayed.

In October 1991, he found out from a friend about the early retirement program. He was upset, but it was not until he learned about other cases in 1995 and 1996 that he realized he might have a claim and contacted counsel.

## IV. CONCLUSIONS OF LAW

The Court now turns to its Conclusions of Law.

All Plaintiffs are long-time NU employees with an average of 34 years of service. Perhaps the level of their commitment to NU is best exemplified by Goncalves, who chose to retire instead of taking disability status because he didn't want to be "dead weight" to the company. As the following Conclusions of Law will show, in the face of this commitment, NU often concealed important information from its employees about their retirement options, and by doing so adopted a policy whereby it betrayed its fiduciary duty to its employees.

### A. Breach of Fiduciary Duty

The parties have spent much of their time before this Court arguing about what fiduciary duty NU owed its employees. This is a thorny question, and requires the Court to balance two important interests: the interest of employees to have access to relevant retirement information, and the interest of employers in maintaining the confidentiality of their deliberative process with regard to downsizing plans.

The Court cannot carve out a specific protocol for employers to follow when seeking to balance these two interests. All the Court can do is assess the facts of this case under the standard that has been set by courts in this Circuit. The Court believes that the touchstone of this standard is one crucial ideal: truthfulness. *Caputo*, 267 F.3d at 193 (quoting *Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 8 (2d Cir.1997) ("[U]pon receiving an inquiry from an employee, the fiduciary must 'convey to a lay beneficiary ... correct and complete material information about his status and options.'")); *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 669 (2d Cir.1994) (quoting *Fischer v. Philadelphia Elec. Co.*, 994

F.2d 130, 135 (3d Cir.1993) ("[W]hen a plan administrator speaks, it must speak truthfully")).

In this case, NU developed a policy that was in stark contrast to this ideal. Instead of doing its best to relay correct and complete information to its employees— large and small—it developed a policy whereby critical information was deliberately withheld from employees, including those charged with counseling other employees about retirement. NU had a fiduciary duty to act otherwise even prior to the formal adoption of any early retirement program. *Mullins v. Pfizer, Inc.,* 147 F.Supp.2d 95, 106 (D.Conn.2001) ("Pfizer had fiduciary obligations with respect to the [early retirement program] even prior to its adoption, and thus was acting in its fiduciary capacity when it spoke to employees about the plan.").

### 1. *Misstatements*

As the Court has alluded, employers have various obligations to their employees under ERISA. One such obligation is that employers have a fiduciary duty with respect to retirement plans to act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a). Employers who "make affirmative material misrepresentations about proposed future changes to an employee benefit plan" breach their fiduciary duty to their employees. *Ballone v. Eastman Kodak Co.,* 109 F.3d 117, 122 (2d Cir.1997) (citing *Mullins,* 23 F.3d at 669); *see also Pocchia v. NYNEX Corp.,* 81 F.3d 275, 278 (2d Cir.1996). Similarly, an employer breaches its fiduciary duty when it makes "guarantees regarding future benefits that misrepresents present facts." *Caputo,* 267 F.3d at 193.

In this case, Plaintiffs argue that NU betrayed its fiduciary duty to its employees by making misstatements to its employees about the future of its retirement policies. In response, NU first argues that for several reasons, any representations made to Plaintiffs cannot be deemed misstatements. The Court disagrees, and finds that the representations cited by Plaintiffs can qualify as misstatements under the relevant standard.

First, the Court rejects the argument that these representations cannot be deemed misstatements because the speakers may have believed them to be true. In this case, NU withheld critical information from its human resources employees so that they could not technically lie to employees when responding to their questions. The fact that human resources employees accurately said "I don't know" does not absolve NU of liability, since "[i]t is not a defense to liability under ERISA that [an employee] was unaware that such consideration had been commenced and thus responded ignorantly but truthfully to the employee's inquiry." *Mathews,* 2002 WL 826804, at *9, 2002 U.S. Dist. LEXIS 7738 at *27; *Fischer,* 994 F.2d at 135.

In addition, NU argues that the responses of human resources personnel were so vague that they cannot be actionable. While the recollection of each Plaintiff differed somewhat, human resources employee Turner described his communication with NU employees as follows: "When asked about the possibility of forthcoming golden handshakes, I consistently responded that I was not aware of any forthcoming plan, or that I did not know of any forthcoming plan." This cannot absolve NU of its fiduciary duty. Statements like "I don't know" are still actionable as misstatements, "the literal truth of [the statement] notwithstanding," as "omissions may be actionable, as well as affirmative statements." *Mullins,* 147 F.Supp.2d at 108. Benefits counselors' claims of ignorance "could have the same

effect as a positive lie." *Id.* These statements, "while undoubtedly a truthful reflection of the state of [an employee's] knowledge at the time, omitted information known to defendant that was important to [the plaintiff's] decision to imminently retire." *Id.*

■ Furthermore, "[ERISA's] obligations cannot be circumvented by building a 'Chinese wall' around those employees on whom plan participants reasonably rely for important information and guidance about retirement." *Fischer*, 994 F.2d at 135. In this case, Coakley and Grise testified that NU's failure to inform human resources personnel of any future offerings was part of a deliberate strategy of keeping all early retirement programs confidential until the minute they were released to all employees. A fiduciary cannot escape liability simply by maintaining the genuine ignorance of its employees, particularly those employees on whom other employees rely for retirement information and advice:

> By establishing [HR] as the appropriate contact person for plaintiff's benefit inquiries, and then failing to provide her with complete and accurate information regarding [the company's] future plans, [the company] induced [plaintiff] to rely upon [HR] and then purposefully closed [HR] off from the company's deliberations.

*Mullins,* 147 F.Supp.2d at 115.

■ Second, the Court rejects NU's argument that any representations made to Plaintiffs were not affirmative, and thus not misstatements, because they were only denials of rumors spreading throughout the company. There is no requirement under ERISA that a misstatement be affirmative, especially where the result of a different type of statement has the same implication. A defendant's "purposeful decision" to keep benefits counselors igno-

rant is "exacerbated by [the defendant's] admitted policy of denying all rumors it viewed as 'unfounded' pertaining to the [early retirement program], thus leaving no implication other than that no retirement enhancements were forthcoming." *Id.* at 109.

Third, the fact that Plaintiffs at some points failed to ask precisely the right questions does not mean that responses to those questions cannot be misstatements. To hold otherwise would place too high a burden on employees, and is contrary to ERISA's fiduciary principles:

> A plaintiff who makes specific inquiry seeking information on golden handshakes or other retirement incentives alerts the fiduciary that such information is material to her, and a response that changes are "only rumors" or "nothing I know of" is more likely to be materially misleading to such a plaintiff than to the claimant making a more generalized inquiry for information bearing on his or her retirement decision, but the latter's claim is not necessarily foreclosed. Rather, the nature of the inquiry factors into the determination of whether a material misrepresentation occurred.

*Hudson v. General Dynamics,* 118 F.Supp.2d 226, 243–44 (D.Conn.2000). To accept NU's position would punish some plaintiffs for failing to use so-called "magic words," while others who asked better-informed or "sophisticated" questions would prevail. *Id.* This would be especially unfair in light of NU's conscious efforts to keep employees unaware of future plan changes: "The same ignorance that precipitates the need for answers often limits the ability to ask precisely the right questions." *Eddy v. Colonial Life Ins. Co. of Am.,* 919 F.2d 747, 751 (D.C.Cir.1990).

Fourth, the Court does not believe that it is only human resources employees whose misstatements could bind NU for liability purposes. A corporate fiduciary is responsible for any material misstatements or omissions made by the agents it chooses to help fulfill its fiduciary obligations. *Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982 (3d Cir.1995). In this case, it is undisputed that NU vested its human resources employees with the duty to meet its fiduciary obligations to relay important information to its employees. The testimony of Plaintiffs revealed, however, that NU encouraged its employees to speak with supervisors as well on such matters, sometimes before approaching human resources. While it is clear, and each Plaintiff agreed, that human resources was the best source of retirement-related information, it is not fatal to Plaintiffs' claims that they may have initially sought out information from their supervisors. In addition, the Court finds it reasonable that several of the Plaintiffs sought information from officers of the company and/or supervisors who may have had specialized knowledge about retirement-related matters.

Finally, the Court rejects NU's argument that any representation made before its adoption of an early retirement program could never be a misstatement, because it dealt with future occurrences. The Second Circuit has specifically rejected this type of argument: "While it is correct ... that [the defendant] need not be prescient, an employer does not enjoy *carte blanche* to make statements that the employer knows to be false, or that have no reasonable basis in fact, simply because the statements concern the future." *Ballone*, 109 F.3d at 126 (citing *Mullins*, 23 F.3d at 669).

Indeed, a company's fiduciary obligation with regard to future benefits becomes a more affirmative obligation when employees have made inquiries about the status of benefits in the past. NU argues the opposite—that it had no obligation to keep employees informed after their inquiries. NU looks to *Pocchia v. NYNEX Corporation* to support its conclusion. 81 F.3d 275. The circumstances of this case, however, are quite different than those in *Pocchia*. Unlike *Pocchia*, where the beneficiary had never made any inquiry regarding future benefit changes, and acknowledged that he had not sought such information when he spoke to his benefits counselor, the Plaintiffs in this case asked time and time again for information. This is a distinction with a great difference.

The case of *Mullins v. Pfizer, Inc.* presented a similar difference. The court distinguished *Pocchia*, and found that an employee had an obligation to keep employees informed, even if "new" early retirement programs were introduced:

> [F]iduciary obligations attach to communications about future benefits, notwithstanding the fact that those communications relate to 'new' plans. The limitations on a fiduciary's obligations contained in *Pocchia* do not serve to insulate [the defendant's] conduct in this case from ERISA review, merely because the [early retirement program] was denominated a 'new' plan. Accordingly, the Court rejects [the defendant's] arguments that it had no fiduciary duties vis-a-vis potential participants in the [early retirement program].

*Mullins*, 147 F.Supp.2d at 107; *see also Ballone*, 109 F.3d at 126 ("There is no requirement that the serious consideration of future benefits is necessary in order for the statement to be deemed misleading."). "[D]efendant had an affirmative duty to correct material misrepresentations that it knew or should have known plaintiff would rely on in timing his retirement," and to

"inform a beneficiary of new and relevant information as it arises." *Mullins v. Pfizer, Inc.*, 899 F.Supp. 69, 77 (D.Conn.1995):

[The Court] rejects defendant's claim that defendant's duty of disclosure is triggered only by a specific inquiry from plaintiff. Here, plaintiff is claiming that he was initially misled by defendant's affirmative misrepresentations that there would be no severance package. If such misrepresentations were made and defendant knew of them, defendant had an affirmative duty to correct material misrepresentations that it knew or should have known plaintiff would rely on in timing his retirement.

*Id.*

Fundamentally, NU argues that it did not breach its fiduciary duty to avoid misstatements because its human resources employees spoke truthfully, based on their own ignorance. In sum, this argument is contrary to ERISA's fiduciary ideal:

A fiduciary cannot leave its front-line benefits counselors in the dark, or instruct them to give noncommittal and nonfactual responses to inquiries regarding potential benefit changes, if the information that is withheld is material to beneficiaries. Such a stance is inconsistent with the mandate that a fiduciary discharge its duties with the care, skill, prudence and diligence required by the statute.

*Mullins*, 147 F.Supp.2d at 109.

### 2. *Materiality*

■ The second inquiry is whether the alleged misstatements were material. The parties have dwelled on the standard for finding materiality in their pleadings, and have argued that different standards, both inside and outside the Second Circuit, are applicable. The Court will now address its understanding of the controlling Second Circuit precedent.

In *Ballone v. Eastman Kodak Company*, the Second Circuit held that "misrepresentations are material if they would induce a reasonable person to rely upon them." *Ballone*, 109 F.3d at 122 (citing *Mullins*, 23 F.3d at 669). Similarly, at least one other court in the Second Circuit has said that materiality is a " 'mixed question of law and fact' based on whether 'there is a substantial likelihood that [a misstatement] would mislead a reasonable employee in making an adequately informed decision about if and when to retire.' " *Mullins*, 23 F.3d at 669 (quoting *Fischer*, 994 F.2d at 135).

NU would like the Court to hold instead that misstatements are only material if a plan change was under "serious consideration" at the time of the misstatement. This is the test applied by a number of other circuit courts, particularly by the Third Circuit. NU cites the case of *Fischer v. Philadelphia Electric Company* as an outline of this alternate test. The Court does not believe that complete reliance on *Fischer* is consistent with the Second Circuit's law on materiality, however, because it is contrary to the Second Circuit's holding in *Ballone*.

In *Ballone*, the Second Circuit discussed the relationship between materiality and serious consideration. The Court held that " '[s]erious consideration' of plan changes is not the *sine qua non* of materiality," and that whether or not a plan change was under serious consideration is "but one factor in the materiality inquiry." *Ballone*, 109 F.3d at 123, 125 (citing *Mullins*, 23 F.3d at 669) ("whether a plan is under 'serious consideration' at the time a misrepresentation is made is relevant to materiality."); *see also Hudson*, 118 F.Supp.2d at 245 (similarly holding that *Ballone* rejected the *Fischer* 'serious consideration' test); *Cf. Ballone*, 109 F.3d at 122–23 (stating that "contrary to the dis-

trict court's interpretation, *Mullins* did not establish a bright-line rule that serious consideration of a future is a prerequisite" to a finding of materiality). The Court did say, however, that "the more seriously a plan change is being considered, the more likely a misrepresentation will pass the threshold of materiality," but that this was not the only factor to consider. *Ballone,* 109 F.3d at 123 (quoting *Mullins,* 23 F.3d at 669). The Court explained:

> Regardless of whether the employer is seriously considering altering its retirement plan, the employer's false assurance that future enhancements have been ruled out for some specific period can be decisive in inducing an employee to hasten retirement, rather than delay in the hope of receiving enhanced future benefits. This aspect of the assurance can render it material regardless of whether future changes are under consideration at the time the misstatement is made.

*Id.* The court's "simple view" was that "when a plan administrator speaks, it must speak truthfully," regardless of how seriously any changes are being considered." *Id.*

Instead, the *Ballone* court held that the principal inquiry is whether the misstatements "would induce a reasonable person to rely upon them." *Id.* at 122 (citing *Mullins,* 23 F.3d at 669). The *Ballone* court listed several other factors, other than serious consideration, that must be considered under this materiality analysis. These factors include:

> [H]ow significantly the statement misrepresents the present status of internal deliberations regarding future plan changes; the special relationship of trust and confidence between the plan fiduciary and beneficiary; whether the employee was aware of other information or statements from the company tending to minimize the importance of the misrepresentation or should have been so aware, taking into consideration the broad trust responsibilities owed by the plan administrator to the employee and the employee's reliance on the plan administrator for truthful information; and the specificity of the assurance.

*Id.* at 125. The application of these factors is a "fact-specific" inquiry which "turns primarily on the nature and the context of any assurance about future benefits." *Id.*

With this analysis in mind, the *Ballone* court found that Kodak, the defendant in that case, had breached its fiduciary duty to its employees. The lower court in that case had found that "serious consideration" began when the Kodak executive responsible for human resources informed other personnel employees that an early retirement program of some kind would be implemented, although details like the divisions to be targeted had not been decided. *Id.* at 122. Under *Ballone* serious consideration began before Kodak's CEO instructed that executive to prepare a plan, before it was approved by Kodak's board, and before it was announced to employees.

### 3. *Application of the standard to this case*

The Court finds that in this case, these factors have been met. The Court believes that the representations made to Plaintiffs, although varied in content, speaker and time, materially misrepresented the status of internal deliberations regarding future plan changes at NU. In addition, the materiality of these misrepresentations was made all the greater by the fact that many, if not all of these representations were made after NU had begin to "seriously consider" the implementation of early retirement programs. All this was done in contravention of the trust relation-

ship that existed between NU and its employees. The Court will now address each of the materiality factors, including a discussion of how the serious consideration analysis plays into these factors.

The Court will first dispense with three of the materiality factors before discussing the last, which involves a more detailed analysis. First, the Court finds that there was indeed a special relationship of trust and confidence between NU and Plaintiffs, such that any statements made by NU were material. The Court notes that it is clear from the testimony presented that Plaintiffs were particularly loyal to NU, and trusted the human resources employees and supervisors upon whom they were instructed to rely. It was undisputed that Plaintiffs, and all NU employees, were encouraged to seek out human resources in order to obtain accurate and complete information—something that regrettably did not occur. By encouraging its employees to seek out human resources for all retirement-related questions, NU established a trust relationship between its employees and that department. By failing to keep human resources informed about retirement-related developments, NU betrayed that trust.

Second, the Court does not find that any Plaintiff was aware of other information or statements from NU tending to minimize the importance of the misrepresentations. Nor does it find that any Plaintiff should have been so aware. NU argues that Plaintiffs should have minimized the importance of what was said to them because it was vague and non-specific. NU's argument is that statements like "I don't know," or "not that I know of," are indefinite enough that Plaintiffs should not have relied on them. Plaintiff after plaintiff testified, however, that they did rely on these statements. They did so on the theory that if human resources didn't know, then there must not have been anything. Considering the trust relationship established by NU between human resources and its employees, this reliance seems quite reasonable.

■ In addition, the Court notes that Plaintiffs did not testify that human resources couched their comments with any sort of important and diminishing information, such as the fact that NU's confidentiality policy prevented human resources from receiving the most accurate information. *Hudson*, 118 F.Supp.2d at 245–46 ("[plan administrators] certainly made no efforts to ascertain whether the information they were disseminating was or continued to be accurate under circumstances of potential change, ... nor did they communicate that they had not inquired, and given negotiation confidentiality, might not have the most complete information."). This omission is important, as "a fiduciary has a duty not only to inform a beneficiary of new and relevant information as it arises, but also to advise him of circumstances that threaten interests relevant to the relationship." *Mullins*, 899 F.Supp. at 77 (quoting *Eddy*, 919 F.2d at 750).

Third, the Court finds that while the assurances offered by NU were not extraordinarily specific, they could still be material. There was some dispute about the specificity of NU's responses to Plaintiffs. NU argued that Plaintiffs' inability to remember the exact words uttered by human resources and other NU representatives is fatal to their claims, as there is a great difference between "no, there is not going to be an early retirement program," and "I don't know if there is going to be an early retirement program." While NU is correct that the specificity of the reassurance is a factor that the Court should consider, the Court disagrees that this is fatal to Plaintiffs' claims. It is true that the level of specificity used in this case is

lower than other cases that have found misstatements to be material, but this only impacts the level of materiality the Court will attribute to a statement, not whether or not the Court can consider it at all.

The fact that the responses by human resources in this case were sometimes vague or non-specific does impact their materiality. The Court believes, however, that the strength of the other materiality factors outweighs this factor. The Court finds this to be the case in part because it believes that the specificity of assurance factor is less important than the other factors. In fact, the Court believes that if NU had made a more specific assurance, it might actually impair Plaintiffs' claim. Indeed, if NU had provided answers to benefits questions with the specificity it now claims to require for materiality, the statements might have been taken as less believable, and thus less material: "In most circumstances, an employee probably cannot rely upon a representation that the employer has decided never to alter its benefits package, for example, because such a statement is too speculative and unbelievable to 'mislead a reasonable employee in making an adequately informed decision about if and when to retire.'" *Ballone*, 109 F.3d at 125 (citing *Mullins*, 23 F.3d at 669).

The last materiality factor discussed in *Ballone*—how significantly the statement misrepresents the present status of internal deliberations regarding future plan changes—is perhaps the most complicated. The Court, in considering it, will weaves in the "serious consideration" analysis, which the Court believes goes hand-in-hand with this last factor. As the court in *Ballone* stated, the extent to which a plan was being seriously considered at the time of the misstatement does not in and of itself make it material, but rather influences the level of materiality assessed to that state-ment. Likewise, the level of consideration at the time of the misstatement reflects how significantly the statement misrepresents the present status of internal deliberations regarding future plans changes.

Before going into detail about the various early retirement programs and the status of NU's deliberations, the Court wishes to dispel several theories proffered by NU. First, the Court disagrees with NU that the status of deliberations at NU could not be material until an early retirement program had been approved by the board of directors. It is clear to the Court that the approval of an early retirement program by the NU board of directors was a mere formality. At many points such programs were on the verge of release just days, even hours, before the board's final approval. For example, on July 30, 1993, the board of directors approved an early retirement program. Just one day before, on July 29, 1993, envelopes with employee communications were being stuffed. If the approval of the board were anything more than a formality, then these type of preparations simply would not have been made.

In *Hudson*, another court in this District reached a similar conclusion. In that case, the court put credence not in the ultimate approval of the plan, but on the investigation and evaluation of the plans at lower corporate levels. *Hudson*, 118 F.Supp.2d at 251. The court recognized that when corporate officers are vested with authority to implement and evaluate plans, whether or not the plan is being seriously considered may rest on what those individuals are thinking, versus what the Board itself knows or believes. *See also Mullins*, 147 F.Supp.2d at 113.

"Employees will learn of potential changes when the company's deliberations have reached a level where an employee should reasonably factor the potential change into an employment decision."

*Fischer,* 96 F.3d at 1541 (finding that serious consideration began when Towers–Perrin, who worked for the defendant in that case, had submitted a recommendation to the defendant, not when the board issued a final approval). The Court believes that when the senior officials responsible for employee benefits begin substantial work on early retirement programs, then serious consideration has begun. *Fischer,* 96 F.3d at 1540 ("[i]t is sufficient for this factor that the plan be considered by those members of senior management with responsibility for the benefits area of business, and who ultimately will make recommendations to the Board regarding benefits operations."). When there is evidence that NU saw the offering of an early retirement program as a company goal, as evidenced by the efforts of its staff to research, prepare for and implement such a program, then NU's fiduciary duty is implicated.

In addition, the Court does not believe that the plans need be identical in order to find that the company was serious about its implementation. Changes will obviously occur, and the elements of an early retirement program in its conceptualization may be revised as it comes closer to its release. *Fischer,* 96 F.3d at 1539 ("A specific proposal can contain several alternatives, and the plan as finally implemented may differ somewhat from the proposal."). Even if this is the case, however, the Court does not believe that the company's consideration of the offering of such a program has changed.

Likewise, the Court does not believe that any so-called "holding patterns" instituted by NU adversely impacted the materiality of the statements made to Plaintiffs. The Court reaches this conclusion for several reasons. First, during these holding patterns NU continued to work on program elements. In May 1991, when the holding pattern began, Towers Perrin and NU were still engaged in final details, such as the preparation of design and communications documents, final approval of program language, and nondiscrimination testing. Second, it does not appear to the Court that these holding patterns were intended to cancel the early retirement program offering, but rather simply to delay it. By analogy, Coakley agreed that the holding pattern was similar to a plane circling an airport waiting to land. Furthermore, the Court's review of relevant NU documents does not show any expression of "if" an early retirement program would be offered, but rather "when." Indeed, Fox and other NU officials wrote at least one Plaintiff a letter in which they said that during time span which encompasses this holding pattern, NU "was evaluating a number of methods for reducing costs, including such a program."

■ In addition, the Court finds that under certain circumstances, NU had the duty to inform Plaintiffs of the status of deliberations at NU, even after they had made their inquiries. NU has urged the Court not to reach this conclusion, in light of the Second Circuit's decision in *Pocchia v. NYNEX Company.* In that case, the court found that NYNEX did not have an affirmative duty to inform its employees, but based its decision, in part, on the fact that employees had not made inquiries beforehand. In *Hudson v. General Dynamics,* another court in this District distinguished *Pocchia* where an employee makes specific inquiries seeking information on early retirement programs and alerts the fiduciary that such information is material to her. In *Hudson,* the Court recognized that in securities cases a duty to correct arises when "a speaker learns that a prior statement was misleading when made." 118 F.Supp.2d at 260 (citing *In re Int'l Business Machines Corp. Secu-*

*rities Litig.*, 163 F.3d 102, 109 (2d Cir. 1998)). Such a duty may also arise where "a statement, reasonable at the time it is made, becomes misleading because of a subsequent event." *Id.* This type of analysis has been applied to an ERISA fiduciary, "if the fiduciary knew or should have known that such misrepresentations had been made and that a beneficiary would rely on them in planning the timing of his or her retirement." *Id.* (citing *Mullins,* 899 F.Supp. at 77); *see also McAuley v. IBM,* 165 F.3d 1038, 1046 (6th Cir.1999) ("when a representation is written, it is ongoing, and may become subject to a duty to correct if it in fact becomes misleading"); *cf. Bins v. Exxon Co.,* 220 F.3d 1042 (9th Cir.2000) (finding a duty only when the employee asks to be kept informed of future plan changes). Based on this precedent, the Court finds that NU was under a duty to inform Plaintiffs of plan changes after their inquiries. The extent of this duty will vary, depending on the nature of the inquiries and the activities of NU at the time.

Finally, the Court believes for the most part that Plaintiffs, if given the correct information, would have stayed at NU past their scheduled retirement date. The nature of this analysis is unavoidably speculative. While NU questions the extent to which Plaintiffs actually relied on the misstatements that were made, and argues that they would have retired anyway, it is really impossible for anyone to definitively say what Plaintiffs would have done. Certainly each Plaintiff had a legitimate and well-reasoned basis for retiring when he did, and in appropriate circumstances, the Court will discuss the specific situations of Plaintiffs. But, in general, the Court relies on common sense to guide its analysis. As the Second Circuit said in *Caputo,* "no reasonable employee would have retired after more than 30 years with the company if they only had to wait a few months to receive an [early retirement incentive]." *Caputo,* 267 F.3d at 192. In addition, the Court takes direction from cases like *Hudson v. General Dynamics,* where the court found that a "slight quantum of information" would have caused plaintiffs to stay in their jobs pending further information. 118 F.Supp.2d at 243–44. The Court agrees that there can be a tremendous amount of materiality in slightly more information.

In light of this analysis, the Court will interweave NU's activities with those of Plaintiffs, incorporating by reference any additional details found in its Findings of Fact on these series of events.

### a. The 1991 Early Retirement Program

Plaintiffs who seek inclusion in the 1991 early retirement program began inquiring about the status of such programs long before it was offered. NU offered an early retirement program in June 1990. The work on the 1991 early retirement program went forward in December 1990, when Towers–Perrin and Coakley began a program design. In December and January 1990, the senior manager responsible for employee benefits, Coakley, and Fox were engaged in detailed discussions about early retirement program options. Just one month prior to this, in November 1990, **LaPorta** inquired of human resources about the state of early retirement programs at NU. LaPorta asked if he would benefit from delaying his retirement, and mentioned the early retirement program rumors. Turner did not reveal anything about NU's plans for an early retirement program. In November 1990, Coakley had not yet received the Towers–Perrin report. Between November 1990 and LaPorta's retirement date of February 1991, however, NU was on notice that LaPorta wanted to know about the release of early retire-

ment programs. As discussed above, NU had a duty to inform him of any changes up until his February 1991 retirement, as if he had inquired at that time. NU failed to do so. LaPorta testified that if they knew that NU was thinking about offering an early retirement program at the time of his retirement, he would have stayed anywhere from three to six months, "maybe longer." While LaPorta's cross examination testimony on this "maybe longer" point was not explored thoroughly, in his deposition (which was read during his testimony) LaPorta said that he believed he would have waited eleven or twelve months longer. The Court finds that LaPorta would have waited to retire for the additional time, 8 months, until the offering date of the 1991 early retirement program.

During the month of December 1990, **Iavarone** sought advice from Turner about the future of retirement at NU. While Iavarone's inquiry was not direct—he said to Turner that it was "too bad" NU wasn't offering an early retirement program—his comments certainly put NU on notice that he was interested in receiving the latest information on early retirement programs. Despite this expressed interest, Iavarone was not told about the activities at NU going on at that time, nor was he updated before his February 1991 retirement. Iavarone testified that if he had known that NU was thinking about offering an early retirement program around the time of his retirement, he would have stayed longer. The Court finds, based on Iavarone's testimony, that he would have stayed at the company until the release date of the early retirement program, had he known that NU was merely considering an early retirement program, as they were between December 1990 and February 1991.

During this time period, specifically between December 1990 and February 1991, **Riccardelli** met with Turner and received no indication of these activities. Nothing else was shared with him before his March 1991 retirement. Riccardelli was "in no hurry" to retire, and had adjusted his retirement plans before. He said that he would have stayed at NU past his retirement date if he had known that there was "something in the winds," even if NU's plans were not definite. Based on Riccardelli's testimony, the Court finds it reasonable that he would have waited to retire until the release date of the early retirement program.

The same fate befell several other Plaintiffs. **Roberge** met with human resources representative Terry in January and February 1991, and met with Turner in February 1991. Nothing was shared with her before her March 1991 retirement. She testified that if she had known that there was a chance of an early retirement program, she would have delayed her retirement, acknowledging that it would have only taken her to the Fall to be eligible for the 1991 early retirement program. For the same reasons as above, the Court finds that she would have continued working.

**Ventsias** and his wife met with Turner in late January 1991. At this time, Ventsias asked Turner to keep him informed of anything that might affect his retirement. Turner did not provide any updates to Ventsias before his March 1991 retirement. Ventsias testified that if he had known that NU was simply "looking at" early retirement programs, he would have delayed his retirement and stayed. Based on this testimony, the Court concludes that Ventsias would have made it to the offering date.

Between March 1991 and May 1991, Coakley and Towers–Perrin continued working on their plans. Program design continued even during the "holding pattern," which began in May 1991. During

this time period, several other Plaintiffs sought information from NU. In February and April 1991, **Klein** met with Turner, and asked him about rumors about early retirement programs. His conversations with Turner did not reflect the status of NU's work on the early retirement program, and nothing was shared with Klein before his April 1991 retirement. Klein testified that if he had known that NU was simply thinking about offering something in the future, he would have pursued a "wait and see" attitude, and not retired. He testified convincingly that he was uncomfortable about retiring, especially at such a young age. It is true that Klein's wife was living outside of Connecticut at the time of his retirement, but they had already been traveling back and forth. He also testified that they had always intended to return to Connecticut, as they now have done, and so the separation, alone, would not have been a deterrent to delaying his retirement.

**Sturgeon** met with Kinney, an officer of NU, in March 1991. Kinney told him that he was not aware of any such programs. Sturgeon trusted this, since Kinney was an officer of the company who could bind the company. He also testified that he spoke with Turner around this same time, although he was unsure of the exact date. He, like the others, was not told anything during those conversations, and nothing before his April 1991 retirement. He testified that had he known that NU was considering an early retirement program, he would have stayed until he reached 65 (three more years). If he had done so, then he would have been eligible for the 1991 early retirement program offering.

**Normandy** first inquired of Turner at the end of January 1991, and asked if he should delay his retirement in case an early retirement program was offered. Turner told him that no such programs would be offered. At the time, however, NU was considering such a program. Normandy testified that at the time of his retirement in May 1991, he was suffering from some health problems, as was his wife. He testified that if he had known that NU was thinking about offering an early retirement program, he would have waited "a couple" of months. If he didn't hear anything, he would have only waited a "couple more" months to retire. The Court finds it reasonable to infer, however, that had he heard that an early retirement program was being worked on—as it was during this period—he would have certainly have stayed with the company for at least one month, at which time the early retirement program was offered.

The same is true for **Schreindorfer,** who spoke with Turner in March 1991, and was told that there was no available program and that even if there was, it would not affect him. Schreindorfer was settled in this Connecticut home, and could have stayed longer in order to find out more about what NU was thinking. The Court finds that he would have stayed past his May 1991 retirement, as evidenced by his testimony.

At this point, during the month of May 1991, NU claims that the early retirement program entered a holding pattern. Even still, NU continued to work on program details.

While **Goncalves** retired around this time, in June 1991, he met with Turner in January 1991 and, accompanied by his wife, in late April 1991. At these meetings, he asked whether there were any forthcoming early retirement programs. Goncalves testified that if he had known that NU was considering an early retirement program, he would have stayed at least six or seven months longer, perhaps taking disability status to deal with his knee problems. This means he would

have still been working at NU when the 1991 early retirement program was announced. The Court finds this to be credible, despite his physical condition, noting that at the time of Goncalves' retirement, he was in a position that did not involve physical labor.

Similarly, **Pennella** met with Turner in January 1991 and, accompanied by his wife, again in late April 1991. Turner said that he was not aware of any plans for an early retirement program. Pennella testified that he would have delayed his July 1991 retirement at least six months if he had known there was a possibility that an early retirement program would be offered. This means he would have still been working at NU when the early retirement program was eventually offered.

Likewise, **LeBrun** and his wife met with Turner in late May 1991, and he retired in July 1991. LeBrun suffered the same material misstatements as the other Plaintiffs, but the Court cannot find in his favor. During his deposition, the only evidence offered at trial, LeBrun was quite clear that he did not know how long he would have stayed to wait for an early retirement program. In fact, he spoke about his regard for the retirement program he was offered. While LeBrun's deposition testimony was certainly marred by his exhaustion during the deposition proceeding, the Court cannot find for him when his statements are contrary to his legal assertion— that he would have waited around the four to five months longer it would have taken to get him to the early retirement program

By the time of **O'Kane's** August 1991 retirement, the early retirement program may have been "back on." At the time of his pre-retirement inquiries, April 1991, for example, NU was actively working on an early retirement program. Even if the program was put "on hold" in May 1991, at the time of O'Kane's inquiries, it had a

planned release. O'Kane also asked questions of Ilberman in July 1991, an officer of the company, who should have been truthful with O'Kane about the state of the program at NU. O'Kane testified that if he had known that NU was considering offering an early retirement program, he would have stayed at least until the end of the year, which would have taken him beyond the eventual release date.

### b. The 1993 Early Retirement Program

In late 1992 and early 1993, NU was engaged in another downsizing study, including the CPR study. At some point during this time period, NU circulated a draft of a proposed early retirement program. In November 1992, **Broga** met with Turner, and Turner indicated that "nothing was coming down the pike." He also asked questions of his supervisors during this time. In February 1993, he retired. If he had known that NU was thinking about offering an early retirement program at this time, he would have stayed at least one year longer, despite any health problems he or his wife were facing. This would have brought him to the August 1993 release date. The difficulty with Broga's claim, however, is that there is no evidence that NU was considering an early retirement program in the period before February 1993. The only activities cited by Plaintiffs began in April 1993. Accordingly, the Court cannot find that NU's misstatements to Broga were material, and thus cannot find on his behalf.

**LeMay** began to talk with Turner in February 1993, and spoke with him again in March 1993 and April 1993. Turner told him nothing about NU's plans; however there is evidence that presentations and reports were circulated around that same time which indicated that NU was considering a further early retirement pro-

gram. If Lemay had known that NU was thinking about offering an early retirement program, he would have delayed his May 1993 a few months, and at least to the time that his wife retired in September 1993. If he had waited this long, he would have benefited from the 1993 early retirement program offering.

**Gamache** met with Turner in May 1993, and asked whether an early retirement program would be offered. Turner said he was not aware of any such program. On June 30, 1993, just one day before Gamache's retirement, the 1993 early retirement program was a "go," but that was not communicated to Gamache. Gamache testified that, although he had grown tired of his work environment, he would have stayed at NU if it was considering offering an early retirement program. While Gamache did say that he would have gone ahead with his retirement if there was no specificity or definiteness to the plans for an early retirement program, the situation at NU was far different at the time of Gamache's inquiries and retirement, and thus the Court finds in his favor.

### c. The 1994 Early Retirement Program

In 1993 and 1994, various additional programs were considered. On June 30, 1994, Coakely wrote a memorandum to this effect, referencing the "current design." A few months earlier, **Lawyer** wrote Coakley asking about future early retirement programs. In response, Coakley told Lawyer that there would be no additional benefit if Lawyer delayed his retirement to November 1994, and so Lawyer instead retired in August 1994. Even if Coakley knew of no plans to offer a 1994 early retirement program in March 1994, he was certainly on notice of Lawyer's interest in such issues. Just one month before Lawyer's retirement, Coak-

ley wrote a memorandum summarizing NU's plans to offer such a program. Coakely had a duty to update Lawyer, which he didn't. Moreover, Lawyer met with human resources employees in June and July 1994 and were told that they were not aware of any future programs. This was only a few months before the program was actually announced.

The foregoing analysis makes clear that NU was not acting in the interest of its participants and beneficiaries during the relevant time period. As discussed, the material misstatements made to some of the Plaintiffs influenced their retirement, and prevented them from accessing the most complete information when making their retirement decision.

## V. CONCLUSION

"[T]o participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.'" *Varity Corp. v. Howe*, 516 U.S. 489, 506, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). In the Court's estimation, NU failed to honor this compact with its employees when it engaged in the confidentiality policy and accompanying material misrepresentations which plagued Plaintiffs. The Court does not believe that NU had to reveal all of its internal plans. For example, NU could have simply told employees what Fox told several of the Plaintiffs after they had retired: "Northeast Utilities has occasionally considered voluntary special retirement programs when such programs would serve the financial and operational needs of the Company. At the time of your retirement, the Company was evaluating a number of methods for reducing costs, including such a program, but no specific plans or decisions had been made." Several Plaintiffs testi-

fied that a statement like this was the type of information that would have been helpful to them when they considered their potential retirement. This type of basic information was not provided, however, and thus for the most part, as described above, the Court finds in favor of NU's employees.

Pursuant to these Findings of Fact and Conclusions of Law, the Court hereby orders relief and judgment shall be entered, as follows:

To do equity and to cure its breach of its own fiduciary duties, NU, as retirement plan administrator and sponsor, is hereby **ORDERED** to take all steps within its authority to modify its retirement plan records to show: (1) that the Plaintiffs Alfred Goncalves, Michael A. Iavarone, Sr., Robert L. Klein, Robert LaPorta, Armand L. Normandy, Donald L. O'Kane, Daniel M. Pennella, Alphonso L. Riccardelli, Mary Roberge, William Schreindorfer, Eugene F. Sturgeon and Constantine Ventsias were retired from employment with NU as of the date of their separations under the terms of the Special Retirement Program adopted by NU on September 30, 1991 and to ensure that said Plaintiffs are provided the Special Retirement Program benefits in accordance with said change; (2) that the Plaintiffs Robert Gamache and Edward W. LeMay were retired from employment with NU as of the date of their separations under the terms of the Special Retirement Program adopted by NU on July 30, 1993 and to ensure that said Plaintiffs are provided the Special Retirement Program benefits in accordance with said change; and (3) that the Plaintiff Lawyer retired from employment with NU as of the date of his separations under the terms of the Special Retirement Program adopted by NU on October 24, 1994, and to ensure that said Plaintiff is provided the Special Retirement Program benefits in

accordance with said change. Judgment will be entered accordingly, and the Court shall reserve jurisdiction to enforce the equitable decree.